HUGHES TOOL COMPANY, Respondent, *v.* UNITED ARTISTS CORPORATION, Appellant.

First Department, February 26, 1952.

*Louis Nizer* of counsel (*Walter S. Beck* with him on the brief; *O'Brien, Driscoll, Raftery & Lawler,* attorneys), for appellant.

*Walter R. Mansfield* of counsel (*Sidney P. Howell, Jr.,* with him on the brief; *Donovan Leisure Newton Lumbard & Irvine,* attorneys), for respondent.

VAN VOORHIS, J. Plaintiff is a motion picture producer, and defendant a distributor. Defendant contracted to distribute a motion picture for plaintiff in various foreign countries. Defendant attempted to offset its collections for plaintiff's account against the liability to defendant of another corporation. Special Term correctly held this to have been an unauthorized offset, and defendant to be chargeable with a breach of contract. The agreement required defendant either to hold plaintiff's share in the box office receipts for plaintiff's account in the currencies of twelve different countries where this motion picture was exhibited, or to deliver these foreign moneys to plaintiff's nominees in the same countries. At the so-called official rates of exchange, these funds would aggregate $68,219.92. A recovery in this amount is included in the judgment against defendant from which it appeals. These funds are blocked by foreign laws, with the consequence that they cannot be converted freely into United States currency. The amount of the recovery should not be affected by the fact that defendant has assets in New York.

The effect of the judgment is to improve plaintiff's position far beyond what it would have been if defendant had not broken the contract. Since plaintiff appointed no nominees to collect these funds abroad, it was the duty of defendant to hold them for plaintiff's account in the currencies of the countries of origin. The judgment appealed from has determined not only that defendant must pay damages for its failure to hold these moneys abroad for plaintiff's account, but also that defendant should pay in an amount computed as though defendant were also under an obligation (not contemplated by the contract) to convert these currencies for plaintiff into United States money. This violates the rule that damages for breach of contract shall be such as have resulted directly and naturally from the breach, and were within the contemplation of the parties (*New York Market Gardeners' Assn.* v. *Adams Dry Goods Co.,* 115 App. Div. 42, affd. 190 N. Y. 514). These parties did not intend that

defendant should solve plaintiff's foreign exchange difficulties. The damages awarded exceeded those resulting from the breach.

The rule that a recovery can be expressed only in the money of the forum does not determine the rate of exchange at which damages computed in foreign money shall be translated into dollars. The burden is upon plaintiff to establish the applicable rates of exchange as much as it is to prove the other necessary elements of damage. Proof of the so-called " official " rate of exchange does not sustain the burden, where it also appears that the foreign currency is blocked for the purpose in suit. This case differs from *Perutz* v. *Bohemian Discount Bank* (279 App. Div. 386) in that the parties in the latter case treated the official rate as also the applicable rate of exchange.

A similar question was passed upon in *Freund* v. *Laenderbank* (277 App. Div. 770 [1st Dept.]) which affirmed without opinion a judgment entered upon a decision by Mr. Justice VALENTE at Trial Term. That case involved a recovery by one Epler for breach of his pension rights as president of the central bank by the Austrian Government after the German Anschluss. The judgment had to be in the United States equivalent of marks, which were blocked. Judgment was entered upon the basis of a five-cent instead of a forty-cent exchange value of the mark. Since the conversion of the foreign currency was prohibited to effect the transaction giving rise to that suit, the forty-cent rate for unrestricted transactions was held to be inapplicable. Plaintiff and defendant appealed, but the judgment was affirmed.

Recognizing a different value in the United States of blocked foreign currency from that of unrestricted currency, is reasonable and in accord with the facts. In determining the amount of damages arising from breach of contract, it is of little avail to know what the official rate of exchange is of French francs or English pounds, for example, if neither pounds nor francs could be converted into dollars at these rates for the purposes of the contract which has been broken. The so-called official rate of exchange means merely that it is the rate at which the foreign government will permit its currency to be exchanged for dollars in order to consummate some transaction which is sanctioned by the foreign state. The countries where plaintiff's funds are impounded have prohibited the employment of their dollar balances to import American movies. In the case of these transactions, it is accurate to say that there is no official rate of exchange. There is no rate officially authorized for transactions that are prohibited.

The purpose of government licenses restricting the operation of foreign exchange markets is to regulate imports and exports. If the exchange transactions in suit were for purposes permitted by the foreign governments, it may well be that we should apply the official rates in computing damages. But, as has been stated, the countries involved have not permitted their slender dollar reserves to be expended for the purchase of motion pictures. Consequently there is no official market rate of exchange for that purpose.

If we decline to employ the official rates in appraising damages in transactions not governed by such rates, neither should the execution of our judgments wait upon the speculative possibility that these foreign currency restrictions may be modified or lifted at some remote future date or dates. This case is not comparable to *Singer* v. *Yokohama Specie Bank* (299 N. Y. 113) or to *Banque Mellie Iran* v. *Yokohama Specie Bank* (299 N. Y. 139) inasmuch as there the judgments were stayed pending the removal of United States licenses, which were temporarily required, would soon be eliminated, and involved recoveries which were measured in dollars in the first instance under the obligations at the foundations of the claims. Upon the other hand, the complexion of the modern world is such as to render impossible the unrestricted transfer of many foreign currencies into dollars for years to come.

The rules of law regarding these matters were developed to a large degree during the nineteenth century and the early part of the twentieth century, when the currencies of most of the world were freely convertible into United States money. It is not suggested that there should be a change in the rule that recoveries can be had only in the money of the forum, but the ease with which foreign obligations can be measured in domestic currency has been impaired by economic and political changes in international relations. Now as in the past, courts must determine realistically the relative values of currencies. It will not do to sacrifice justice to the easy way of resorting, as a substitute for a free market, to an official rate of exchange that has been established for other purposes and does not apply to transactions in controversy; and it would be impractical as well as unjust to stay executions upon judgments until the removal of currency restrictions by foreign governments, which, in the foreseeable future, they cannot accomplish in many cases except at the expense of national survival. The last-mentioned course would, moreover, subject the parties to the hazards of currency fluctuations, whether managed or other-

wise, occurring after judgment during the indefinite future, on the assumption that the world will soon return to nineteenth and early twentieth century conditions which may never recur.

This problem can at present be solved in some instances, by utilizing, as a measure of damage, whatever value there may be in New York of blocked foreign currencies. That would reduce the judgment to the value of the blocked foreign currency at the place of the forum, which is all that plaintiff is entitled to receive, and would eliminate the necessity for stays pending the removal of foreign exchange restrictions. Such a market unquestionably exists in the case of some currencies. No illegality that we can recognize is likely to be involved in the transfer in New York of the title to foreign balances which remain in the foreign countries. An American corporation, for example, selling its products abroad for foreign money which it cannot directly convert into dollars, may well dispose of its foreign exchange for dollars at a discount to some other corporation whose business requires it to buy raw materials or other goods in the same country. From the necessities of the case, such transactions must be taking place upon a considerable scale. Such a market, where it exists, might well furnish a standard of judgment in cases of this type.

Such a method of measuring value in the United States of foreign blocked currency is not new. It has been employed by the Tax Court of the United States (*Estate of Fokker* v. *Commissioner*, 10 U. S. T. C. 1225; *Landau* v. *Commissioner*, 7 U. S. T. C. 12; *Estate of Fry* v. *Commissioner*, 9 U. S. T. C. 503). In the last-mentioned case the court said (p. 509): "The next question is to determine the value of the British assets. The credit with Cavendish and the Liverpool Borax shares were blocked at the time of the decedent's death, i.e., they could not be transmitted to the United States nor could their equivalent at the official rate of exchange be realized in any way in the United States. There was a lawful way, however, fully described by witnesses, under which a certain amount could be realized in the United States as a result of the decedent's ownership of those assets. The value of those assets to be included in the gross estate can not exceed that amount. *Morris Marks Landau*, 7 T. C. 12."

In the *Landau* case the court said (p. 15): "This finding is based largely upon the uncontradicted testimony that 'blocked' South African pounds in the United States had a fair market value in December, 1941 of $1.75 to $2.25 per pound, and $2 per

pound; that such pounds had no collateral value whatever; that the official rate of exchange applied to ' free ' pounds as distinguished from blocked pounds; that it was practically impossible to free any South African pounds from exchange control restrictions; and that the value fixed for these South African pounds must take into consideration the fact that they cannot be transferred from the Union of South Africa."

The inapplicability of official rates to this kind of situation was recognized in *Strauss* v. *United States Lines Co.* (180 Misc. 664 [App. Term, 1st Dept.]; *Eck* v. *N. V. Nederlandsch Amerikaansche*, 183 Misc. 691, 692, and *Eder* v. *Commissioner of Internal Revenue* (138 F. 2d 27 [C. A. 2d]).

In Story's Conflict of Laws (1877 ed., § 309) the learned author said: " The proper rule would seem to be, in all cases, to allow that sum in the currency of the country where the suit is brought, which should approximate most nearly to the amount to which the party is entitled in the country where the debt is payable, *calculated by the real par, and not by the nominal par, of exchange.*" (Italics supplied: quoted by Rifkind, 26 Col. L. R. 562.)

Courts have been astute to discover value under novel and difficult circumstances where that has been necessary to accomplish justice (*Heiman* v. *Bishop,* 272 N. Y. 83), and plaintiff will have opportunity at a trial to show whether there are markets of the kind above described in the case of currencies of the countries where plaintiff's motion picture was exhibited or other suitable methods of computing relative values of currencies. A reasonable number of sales here of title to blocked foreign currency which remains abroad may well suffice to determine the existence of such a market, or there may be other methods of ascertaining the values here of these blocked foreign currencies.

That an " official " rate does not automatically solve the problem, is indicated by cases holding that where it has been found necessary to determine value of other commodities than foreign money, even market quotations are subject to adjustment unless they truly reflect the value. It was so held in the appraisal of securities in *Matter of Fulton* (257 N. Y. 487). In *Buyer* v. *Mercury Tech. Cloth & Felt Corp.* (301 N. Y. 74) in order to establish a market price, plaintiffs were required to show that the goods in question were available for purchase in the market at that figure. The " official " Office of Price Administration (OPA) ceiling price was held not to prove the

point where market value was the measure of damage, in the absence of evidence that goods in question could actually be bought and sold at the OPA ceiling.

In computing damages, market value has been held to be the price at which the commodity could be replaced (*O'Gara* v. *Ellsworth,* 85 App. Div. 216). In *207–17 West 25th St. Co.* v. *Blu-Strike Safety Razor Blade Co.* (277 App. Div. 93) damages were to be measured by rental value, which was held not necessarily to be reflected by the " official " rent fixed by the emergency rent laws. An assessment of damages was ordered, and the case remanded with instructions to the trial court to ascertain the existence of an actual rental market value, and in that event to assess the damages on the basis of the actual market. Citations could be multiplied in various fields of the law, where it has been found necessary to determine market values in order to assess damages under varying circumstances. Even in cases where it has been necessary to make valuations in the absence of sales, all relevant factors are required to be taken into account (*Heiman* v. *Bishop, supra*; *Matter of Board of Water Supply of New York,* 277 N. Y. 452). In evaluating foreign currency, the circumstance that it is blocked is a factor of prime importance which makes it impossible to use the official rate as the sole standard, and requires the courts to seek a just standard of value elsewhere.

As was done in *207–17 West 25th St. Co.* v. *Blu-Strike Safety Razor Blade Co.* (*supra*) a trial should be had herein to determine the facts with respect to market conditions in New York for the transfer of title to these blocked foreign currencies, and to determine the market or other true values thereof at the place of the forum. A similar procedure was followed by the United States Court of Appeals in this circuit in *Eder* v. *Commissioner of Internal Revenue* (138 F. 2d 27, *supra*).

Special Term held that whatever rates of exchange are applicable should be taken as of the date of the breach of contract, rather than the time of judgment, citing *Hoppe* v. *Russo-Asiatic Bank* (235 N. Y. 37). That conclusion appears to be correct under the facts of this case. Although the contract was to be performed abroad in terms of foreign currencies, plaintiff's principal place of business is in the United States, and the circumstances indicate that in the normal course of business it would have reduced the foreign funds to United States currency as soon as it was entitled to receive them and to the extent that it would have been able to do so (*Orlik* v.

*Wiener Bank Verein,* 204 App. Div. 432). In *Matter of United Shellac Corp. (Jordan, Ltd.)* (277 App. Div. 147) we held that even under the rule of the United States Supreme Court, the arbitrators were within their powers in applying the rate of exchange at the time of the breach of contract, since it occurred in this country. It may well be that there are exceptions to the breach date rule laid down by such decisions as *Hoppe* v. *Russo-Asiatic Bank* (235 N. Y. 37, *supra*) or *Parker* v. *Hoppe* (257 N. Y. 333, 258 N. Y. 365) and that when applied to particular factual situations there may be less discrepancy than is commonly supposed between the New York decisions and the rule adopted by the United States Supreme Court (*Deutsche Bank* v. *Humphrey,* 272 U. S. 517, 519), the American Law Institute (Restatement, Conflict of Laws, § 424) and indorsed by Professor Williston (5 Williston on Contracts, § 1410A). In *Shaw, Savill, Albion & Co.* v. *The Fredericksburg* (189 F. 2d 952) the United States Circuit Court of Appeals in this circuit appears to have considered that the customary generalizations upon this subject are oversimplified. However that may be, there is no occasion in the present case to depart from the breach date rule.

The judgment and order appealed from should be modified by granting a trial with respect to the $68,219.92 included in the recovery by reason of unconverted foreign currencies, in order to determine what were the circumstances in New York at the time of the breach of contract relating to the values of such blocked foreign moneys, as outlined in this opinion, and to determine such correct values to the extent that they may be ascertained, and as so modified, affirmed, with costs to the appellant. Settle order on notice.

PECK, P. J., GLENNON and SHIENTAG, concur; CALLAHAN, J., dissents and votes to affirm upon the ground that no triable issue appears to be raised concerning the rate of exchange.

Judgment and order modified in accordance with the opinion herein and, as so modified, affirmed, with costs to the appellant. Settle order on notice.