Van Voorhis, J. (dissenting).
The State complains of the method of assessing compensation for the condemnation for highway purposes of 3.221 acres of land out of a tract of 13.939 acres. A fraction of an acre of this 13.939 acres was acquired by claimant St. Agnes Cemetery in 1931 and the rest in 1938 at a total cost of $22,500. For the 3.221 acres and damages to the remainder of the 13.939-acre tract, the Court of Claims awarded $209,000, plus interest from the date of appropriation on November 20, 1952, amounting in all to $230,712.78. It is conceded by respondent that no consequential damage has resulted to any other portion of the cemetery.
Although the cemetery, containing about 150 acres, has been in existence for almost a century, no part of this tract of 13.939 acres has ever been developed; no burials have been made in it, and not a single plot has been sold in this area. All that *48 existed on the date of appropriation, insofar as this portion of the cemetery was concerned, was a plan by a sales organization, proposing to lay out the area into plots and to build a road through it to connect with the developed portion of the cemetery. As far as the physical condition of the land is concerned, it was vacant, unimproved land, apparently in the same condition in which it was when it was purchased. The cemetery was engaged in developing shrines north of the area affected by the condemnation. To this end it had entered into an agreement with a sales organization to develop the shrines and to put on a sales campaign to induce customers to buy lots before they were actually needed. These pre-need lots were sold at the rate of $300 per lot, payable in installments over a period of 2% years with a 5% discount for payment in 90 days. These lots were distinguished from the immediate need lots which were sold at the rate of $400 a lot, with one-third down and the balance payable in 90 days. From the sales prices of the preneed lots, the claimant’s witnesses made deductions of 75% (including 25% for development, 20% for perpetual care, and 30% for planning and selling expenses) to arrive at a net profit to the cemetery of $75 for each pre-need lot. From the prices for the immediate need lots, the claimant’s witnesses made deductions of 45% (including 20% for perpetual care and 25% for development) leaving a net of $220. They concluded that the cemetery would have an average profit of $147.50 per lot. They then assumed that a similar development could be made of the area affected by the condemnation, with sales at the same prices and profits at the same rate. They estimated that the total number of lots that could be sold out of the 13.939-acre tract, as so developed, would be 2,912 lots. They multiplied this number by the average profit per lot and decided that this was the amount that the cemetery would realize when all the lots in the tract were sold — 3,720 unsold lots remained in the developed portion.
The Court of Claims multiplied the average prospective profit per lot (as assumed by the claimant’s witnesses) by the number of lots which those witnesses said would be sold every year. The court computed the award as the present value of the sum of this series of predicted annual payments, discounting these predicted annual payments on a 2% basis. In other words, the court accepted the claimant’s forecasts and its calculations *49 as to net profit, and assumed that a purchaser would pay for the property, as of the date of taking, a cash sum which at 2% over a period of 40 years would exactly equal, the amount of the profit that the claimant says it could derive from the sale of burial lots plus consequential damages to the rest of the 13.939-acre tract.
The State’s witnesses estimated the market value of the tract at $42,000, the value of the remainder after the taking at $16,000, leaving a difference or damage of $26,000. The witnesses on the other side valued the 13.939 acres at $429,500 and the damage at $327,000. These enormous discrepancies call for careful examination. The State contends that the claimant’s witnesses used an erroneous method in that they simply capitalized prospective profits and that, in adopting this method, the courts below committed error.
The trial court justified this method of valuation by reference to the standard of 1 ‘ what a willing buyer would pay in cash to a willing seller.” It is quite clear, however, that far from being what a willing buyer would pay in cash to a willing seller, the award is rather the maximum amount which under any circumstances and by the widest stretch of the imagination could be derived from the projected sale of burial lots out of this 13.939 acres. It seems most unlikely that a purchaser could be induced to pay such maximum amount. He might prefer to keep his cash in a savings bank or invest it in United States government bonds with greater security and at a higher rate of return than the 2% assumed by the trial court. And he would prefer to follow this course because the maximum amount arrived at by the process adopted by the trial court would involve so many uncertainties that he would want to reduce this maximum amount very considerably to allow for the possibility that many of the court’s assumptions as to the number and rate of sales, the difficulties of collection, the expenses involved in maintaining the cemetery, and other relevant factors would not be borne out by the actual facts over the 40-year period assumed by the court.
The court’s determination of this maximum amount involves so many conjectural and speculative amounts that in our view the award should be reversed. In the first place, the trial court took it for granted that once land has been included in a cemetery, or falls into the possession of a cemetery, it becomes *50 immediately available for sale as individual burial lots. If this taking had occurred the day after the cemetery purchased the property, an allowance on the basis adopted by the trial court would have been plainly excessive; and is excessive now in the light of the fact that this land has lain undeveloped for 14 years during which time not a single plot has been sold out of the area. There is nothing in the testimony to indicate that there was an active demand for plots out of this area on the date of appropriation, or that the cemetery was ready to meet this demand on that date. The uncertainty of the sale of lots even out of the developed areas is indicated by the high rate of commissions — 30% —which the cemetery agreed to pay to the selling organization. While the trial court decided it would take 40 years to sell the lots out of this area, there was no finding as to the date when sales from this area would begin. If these lots were not available for sale for a number of years, the trial court’s calculations would be wide of the mark.
Another speculative element was the period during which it was assumed that these retail sales would be made. Claimant’s witnesses fixed a period of 40 years which they then cut in half and then again in half, making their computations as though the retail sales prices of all the individual lots would be collected in a lump sum at the end of 10 years. The State’s witnesses estimated that the period over which lots would be sold might be 30 years and the trial court decided that 40 years was the appropriate time. By their nature these were nothing but conjectures, and they can hardly be the basis for an award to be paid to an owner for taking private property for public use. Fluctuations in sales prices over a period of 40 years, as well as changes in the value of the dollar, do not diminish the speculative uncertainties.
Most conjectural of all, perhaps, were the deductions that were made from the assumed gross sales prices of the individual lots. In addition to the deduction of sales commissions of 30% for the pre-need lots, the court took into consideration a deduction of 25% for development of the area and of 20% for the perpetual care of the lots. The deductions thus amounted to 75% for the pre-need lots and 45% for the immediate need lots. However, no deductions were made for administration expenses nor even for the permanent and current maintenance of the cemetery. According to one of the State’s witnesses, these *51 deductions would have amounted to 95% of the retail sales price of the individual lots.
Even if we were to disregard all of the speculative and conjectural elements in these calculations, and were to agree that the finding accurately indicated the amount that might be derived from the sale of lots out of the area affected by the condemnation projected over a period of 40 years, this amount could not be regarded as fixing what “ a willing buyer would pay in cash to a willing seller ” at the appropriation date. It is not synonymous with market value. The market value depends upon what a purchaser would pay for the 2,912 lots in this undeveloped portion of the cemetery at the appropriation date, not upon how much it is imagined could be realized from their individual sales during the unknown future. The existing market for these lots is necessarily affected by the circumstance that 3,720 additional lots remained unsold in the original, developed part of the cemetery. In other words, assuming the affected 13.939 acres to have been subdivided and developed — which it has not been •— there would have been 6,632 unsold lots in the cemetery at the time of taking. Each lot contained four burial spaces, which signifies 26,528 vacancies in the cemetery. It is inconceivable that another cemetery purchasing this property would have paid such a sum as has been awarded for these undeveloped lots. The price which would be paid by such a purchaser would not have corresponded with what St. Agnes Cemetery might realize from individual sales during a possible 40 years, but would have been determined by what such a purchaser would have had to pay for other comparable property. It is said that the highest and best use of this land is as cemetery property, but this property has no uniqueness of its own which makes it available for cemetery use. "What makes it cemetery property is not its location or its physical characteristics but the nature of its ownership. This property could be sold for cemetery purposes only to a purchaser equipped with the legal powers, authorizations and permits necessary to operate a cemetery. Such a purchaser would not pay more for it than for other comparable property, not now devoted to cemetery purposes, that it could convert to such use.
In New York Central R. R. Co. v. Maloney (234 N. Y. 208, 218) the following statement was made concerning quarry property: " The question in such a case is not merely whether *52 the property is peculiarly adapted for the special use claimed for it, even with deposits * * * such as have been enumerated, but whether or not purchasers can be found who would pay more for it because of the adaptability to the use to which the same might be applied.” In Sparkill Realty Corp v. State of New York (268 N. Y. 192), where quarry land had been valued upon a capitalization of anticipated profits, this court said (p. 198): “ this award was made upon a conclusion conjectured from data founded only in speculation.” In Laureldale Cemetery Co. v. Reading Co. (303 Pa. 315, 324) the Pennsylvania court held: “We find nothing in this case which justified the application of an exceptional measure of damages to the land appropriated. The market value measure of damages meets all the requirements of just compensation in this case, for if any piece of land possesses attributes that stimulate competition for its ownership, this affects its market value favorably. If there is no competition for its ownership, trial judges cannot permit values to be increased in the courtroom by a calculation based on anticipated profits, for it is a common experience that there is a painful gap between profits anticipated and profits realized.” In George Washington Mem. Park Cemetery Assn. v. Memorial Development Corp. (141 N. J. Eq. 47, 60) the New Jersey court said: “ The cemetery permit cost $50,000. The land $85,000. I fail to see by what feat of legerdemain a combination of the two, ipso facto, increases the value of the land, in its natural and unimproved state, as of the date of conveyance, to $1,000,000 or better.”
The claimant introduced no evidence concerning what a willing buyer would pay for cemetery lots of this nature in the aggregate, nor was evidence introduced to show what land was available for cemetery purposes in the Albany area and at what prices. Consequently the record lacks essential evidence on which to base an award. The estimated selling price of individual lots over a long period of years, if admissible at all, could not furnish the sole measure of damage. In Nichols on Eminent Domain (Vol. 4, § 12.3142, subd. [1]) the subject of value for potential building sites is analyzed. The author states concerning this question, which is identical with the one presented on this appeal: “It is well settled that if land is so situated that it is actually available for building purposes, its value for such purposes may be considered, even if it is used *53 as a farm or is covered with brush and boulders.[1] The measure of compensation is not, however, the aggregate of the prices of the lots into which the tract could be best divided, since the expense of cleaning off and improving the land, laying out streets, dividing it into lots, advertising and selling the same, and holding it and paying taxes and interest until all the lots are disposed of cannot be ignored and is too uncertain and conjectural to be computed.[2] The measure of compensation is the market value of the land as a whole, taking into consideration its value for building purposes if that is its most available use.” (Italics supplied.)
The good will or ecclesiastical approval of this cemetery is not an element of damage in condemnation proceedings (Banner Milling Co. v. State of New York, 240 N. Y. 533, cert. denied 269 U. S. 582).
Other cases have held that evidence of profits, while competent to show an adequate or best use, may not be employed to increase the value of the subject property, inasmuch as the good will and management on which they are based may well be transferred to the conduct of the business or activity elsewhere (Humbert v. State of New York, 278 App. Div. 1041, affd. 303 N. Y. 929; Burdick v. State of New York, 276 App. Div. 1052, affd. 302 N. Y. 670).
When this diocesan cemetery is filled, as eventually it will be, at whatever future date, other property will be acquired for the burial of communicants in Roman Catholic parishes in the Diocese of Albany. The time when that will be done is accelerated in some degree by this appropriation. The extent of the loss to the cemetery is materially affected by the cost and whatever difficulties may be attendant upon the acquisition of other suitable cemetery property in Albany County. The quantity of land which is available for cemetery purposes has become limited in metropolitan areas, which has its effect upon the value of land in such vicinities that is already laid out for cemetery purposes. The value of land of that character is less, *54 where the supply of it is greater. The defect in the order appealed from consists in the refusal to recognize this important factor as bearing upon the value of the land taken. There is testimony by one witness that land is not available in the immediate vicinity, but that does not answer whether potential cemetery property in the Albany area as a whole is scarce or plentiful, costly or cheap.
Moreover, claimant was not entitled to resort to any other measure of value than market value unless and until it had established that there is no market value (Hughes Tool Co. v. United Artists Corp., 279 App. Div. 417, 423-424, affd. 304 N. Y. 942; Matter of Board of Water Supply, 277 N. Y. 452; Heiman v. Bishop, 272 N. Y. 83).
In the absence of such evidence, the judgment appealed from should be reversed and a new trial granted.
Conway, Ch. J., Desmond and Froessel, JJ., concur with Burke, J.; Van Voorhis, J., dissents in an opinion in which Dye and Fuld, JJ., concur.
Judgment affirmed.

. 'Citing Matter of Daly v. Smith (18 App. Div. 194); Matter of Simmons (141 App. Div. 120, affd. 202 N. Y. 606); St. Albans Land Corp. v. State of New York (254 App. Div. 395).

. Citing Matter of Daly v. Smith (18 App. Div. 194); Matter of Simmons (66 Misc. 204). [In Matter of Simmons, 141 App. Div. 120, affd. 202 N. Y. 606, the Appellate Division found that all of the lots were then presently saleable.]