SPANG INDUSTRIES, INC., FORT
PITT BRIDGE DIVISION, a cor-
poration, Plaintiff-Appellant,

v.

The AETNA CASUALTY AND
SURETY CO., a corporation,
Defendant-Appellee.

TORRINGTON CONSTRUCTION CO.,
INC., Plaintiff-Appellee,

v.

SPANG INDUSTRIES, INC., FORT
PITT BRIDGE DIVISION, a corpora-
tion, Defendant-Third-Party Plaintiff-
Appellant,

v.

SYRACUSE RIGGING CO., INC.,
Third-Party Defendant.

No. 193, Docket 74–1232.

United States Court of Appeals,
Second Circuit.

Argued Jan. 20, 1975.

Decided Feb. 26, 1975.

William T. Marsh, Butler, Pa. (McNamee, Lochner, Titus & Williams, Albany, N. Y., Earl H. Gallup, Jr., Albany, N. Y., on the brief), for plaintiff-appellant.

Homer E. Peters, Albany, N. Y. (McClung, Peters & Simon, Albany, N. Y., Livingston T. Coulter, Albany, N. Y., of counsel), for defendants-appellees.

Before WATERMAN, HAYS and MULLIGAN, Circuit Judges.

MULLIGAN, Circuit Judge:

Torrington Construction Co., Inc. (Torrington), a Connecticut corporation, was the successful bidder with the New York State Department of Transportation for a highway reconstruction contract covering 4.47 miles of road in Washington County, New York. Before submitting its bid, Torrington received an oral quotation from Spang Industries, Inc., Fort Pitt Bridge Division (Fort Pitt), a Pennsylvania corporation, for the fabrication, furnishing and erection of some 240 tons of structural steel at a unit price of 27.5 cents per pound; the steel was to be utilized to construct a 270 foot long, double span bridge over the Battenkill River as part of the highway reconstruction. The quotation was confirmed in a letter from Fort Pitt to Torrington dated September 5, 1969, which stated in part: "Delivery to be mutually agreed upon." On November 3, 1969, Torrington, in response to a request from Fort Pitt, advised that its requirements for delivery and erection of the steel would be late June, 1970. On November 12, 1969, Fort Pitt notified Torrington that it was tentatively scheduling delivery in accordance with these requirements. On January 7, 1970, Fort Pitt wrote to Torrington asking if the June, 1970 erection date was still valid; Torrington responded affirmatively on January 13, 1970. However, on January 29, 1970, Fort Pitt advised that it was engaged in an extensive expansion program and that "[d]ue to unforeseen delays caused by weather, deliveries from suppliers, etc., it is our opinion that the June date cannot be met." On February 2, 1970, Torrington sent a letter requesting that Fort Pitt give a delivery date and, receiving no response, wrote again on May 12, 1970 requesting a written confirmation of the date of delivery and threatening to cancel out if the date was not reasonably close to the originally scheduled date. On May 20, 1970, Fort Pitt responded and promised that the structural steel would be shipped early in August, 1970.

Although some 25 tons of small steel parts were shipped on August 21, 1970, the first girders and other heavy structural steel were not shipped until August 24, 26, 27, 31 and September 2 and 4, 1970. Fort Pitt had subcontracted the unloading and erection of the steel to Syracuse Rigging Co. but neglected to

advise it of the August 21st shipment. The steel began to arrive at the railhead in Shushan, New York about September 1st and the railroad demanded immediate unloading. Torrington was therefore compelled to do the unloading itself until Syracuse Rigging arrived on September 8, 1970. Not until September 16 was there enough steel delivered to the job site to permit Syracuse to commence erection. The work was completed on October 8, 1970 and the bridge was ready to receive its concrete deck on October 28, 1970. Because of contract specifications set by the State requiring that concrete be poured at temperatures of 40° Fahrenheit and above, Torrington had to get special permission from the State's supervising engineer to pour the concrete on October 28, 1970, when the temperature was at 32°.

Since the job site was in northern New York near the Vermont border and the danger of freezing temperatures was imminent, the pouring of the concrete was performed on a crash basis in one day, until 1 a. m. the following morning, which entailed extra costs for Torrington in the form of overtime pay, extra equipment and the protection of the concrete during the pouring process.

In July, 1971, Fort Pitt instituted an action against Aetna Casualty and Surety Co., which had posted a general contractor's labor and material bond, in the United States District Court for the Western District of Pennsylvania, seeking to recover the balance due on the subcontract, which at that point was $72,247.37 with interest. Thereafter in 1972 Torrington made two further payments totalling $48,983.92. That action was transferred pursuant to 28 U.S.C. § 1406(a) to the United States District Court for the Northern District of New York by order dated December 9, 1971. In the interim, Torrington had commenced suit in New York Supreme Court, Washington County, seeking damages in the sum of $23,290.81 alleged to

be caused by Fort Pitt's delay in furnishing the steel. Fort Pitt then removed the case to the United States District Court for the Northern District of New York (where the two cases were consolidated), and counterclaimed for the balance due on the contract. From May 29 to 31, 1973, the cases were tried without a jury before Hon. James S. Holden, Chief Judge of the United States District Court for the District of Vermont, who was sitting by designation. On September 12, 1973, Judge Holden filed his findings of fact and conclusions of law in which he held that Fort Pitt had breached its contract by its delayed delivery and that Torrington was entitled to damages in the amount of $7,653.57. He further held that Fort Pitt was entitled to recover from Torrington on the counterclaim the sum of $23,290.12, which was the balance due on its contract price plus interest, less the $7,653.57 damages sustained by Torrington. He directed that judgment be entered for Fort Pitt against Torrington and Aetna on their joint and several liability for $15,636.55 with interest from November 12, 1970.[1]

Fort Pitt on this appeal does not take issue with any of the findings of fact of the court below but contends that the recovery by Torrington of its increased expenses constitutes special damages which were not reasonably within the contemplation of the parties when they entered into the contract.

I

While the damages awarded Torrington are relatively modest ($7,653.57) in comparison with the subcontract price ($132,274.37), Fort Pitt urges that an affirmance of the award will do violence to the rule of Hadley v. Baxendale, 156 Eng.Rep. 145 (Ex. 1854), and create a precedent which will have a severe impact on the business of all subcontractors and suppliers.

---

1. A third party action by Fort Pitt against Syracuse Rigging Co. was resolved by judgment for Syracuse with costs. No appeal from that judgment has been taken and it is not before this court.

■ While it is evident that the function of the award of damages for a breach of contract is to put the plaintiff in the same position he would have been in had there been no breach, Hadley v. Baxendale limits the recovery to those injuries which the parties could reasonably have anticipated at the time the contract was entered into. If the damages suffered do not usually flow from the breach, then it must be established that the special circumstances giving rise to them should reasonably have been anticipated at the time the contract was made.[2]

There can be no question but that Hadley v. Baxendale represents the law in New York and in the United States generally. E. g., Hughes Tool Co. v. United Artists Corp., 279 App.Div. 417, 110 N.Y.S.2d 383 (1st Dep't 1952), aff'd, 304 N.Y. 942, 110 N.E.2d 884 (1953); J. Calamari & J. Perillo, Contracts 329 (1970); C. McCormick, Damages § 138 (1935); 11 S. Williston, Contracts § 1356 (3d ed (W. Jaeger) 1968); Restatement of Contracts § 330 (1932). There is no dispute between the parties on this appeal as to the continuing viability of Hadley v. Baxendale and its formulation of the rule respecting special damages, and this court has no intention of challenging or questioning its principles, which Chief Judge Cardozo characterized to be, at least in some applications, "tantamount to a rule of property," Kerr S. S. Co. v. Radio Corporation of America, 245 N.Y. 284, 291, 157 N.E. 140, 142 (1927).

■ The gist of Fort Pitt's argument is that, when it entered into the subcontract to fabricate, furnish and erect the steel in September, 1969, it had received a copy of the specifications which indicated that the total work was to be completed by December 15, 1971. It could not reasonably have anticipated that Torrington would so expedite the work (which was accepted by the State on January 21, 1971) that steel delivery would be called for in 1970 rather than in 1971. Whatever knowledge Fort Pitt received after the contract was entered into, it argues, cannot expand its liability, since it is essential under Hadley v. Baxendale and its Yankee progeny that the notice of the facts which would give rise to special damages in case of breach be given at or before the time the contract was made. The principle urged cannot be disputed. Czarnikow-Rionda Co. v. Federal Sugar Refining Co., 255 N.Y. 33, 41, 173 N.E. 913, 915 (1930); 11 S. Williston, supra, § 1357; Restatement, supra, § 330. We do not, however, agree that any violence to the doctrine was done here.

■ Fort Pitt also knew from the same specifications that Torrington was to commence the work on October 1, 1969. The Fort Pitt letter of September 5, 1969, which constitutes the agreement between the parties, specifically provides: "Delivery to be mutually agreed upon." On November 3, 1969, Torrington, responding to Fort Pitt's inquiry, gave "late June 1970" as its required

2. The rule of Hadley v. Baxendale was stated by Alderson, B., as follows:

Where two parties have made a contract which one of them has broken, the damages which the other party ought to receive in respect of such breach of contract should be such as may fairly and reasonably be considered either arising naturally, i. e., according to the usual course of things, from such breach of contract itself, or such as may reasonably be supposed to have been in the contemplation of both parties, at the time they made the contract, as the probable result of the breach of it. Now, if the special circumstances under which the contract was actually made were communicated by the plaintiffs to the defendants, and thus known to both parties, the damages resulting from the breach of such a contract, which they would reasonably contemplate, would be the amount of injury which would ordinarily follow from a breach of contract under these special circumstances so known and communicated. But, on the other hand, if these special circumstances were wholly unknown to the party breaking the contract, he, at the most, could only be supposed to have had in his contemplation the amount of injury which would arise generally, and in the great multitude of cases not affected by any special circumstances, from such a breach of contract.
156 Eng.Rep. at 151.

delivery date and, on November 12, 1969, Fort Pitt stated that it was tentatively scheduling delivery for that time. Thus, at the time when the parties, pursuant to their initial agreement, fixed the date for performance which is crucial here, Fort Pitt knew that a June, 1970 delivery was required. It would be a strained and unpalatable interpretation of Hadley v. Baxendale to now hold that, although the parties left to further agreement the time for delivery, the supplier could reasonably rely upon a 1971 delivery date rather than one the parties later fixed. The behavior of Fort Pitt was totally inconsistent with the posture it now assumes. In November, 1969, it did not quarrel with the date set or seek to avoid the contract. It was not until late January, 1970 that Fort Pitt advised Torrington that, due to unforeseen delays and its expansion program, it could not meet the June date. None of its reasons for late delivery was deemed excusable according to the findings below, and this conclusion is not challenged here. It was not until five months later, on May 20, 1970, after Torrington had threatened to cancel, that Fort Pitt set another date for delivery (early August, 1970) which it again failed to meet, as was found below and not disputed on this appeal.

We conclude that, when the parties enter into a contract which, by its terms, provides that the time of performance is to be fixed at a later date, the knowledge of the consequences of a failure to perform is to be imputed to the defaulting party as of the time the parties agreed upon the date of performance. This comports, in our view, with both the logic and the spirit of Hadley v. Baxendale. Whether the agreement was initially valid despite its indefiniteness or only became valid when a material term

was agreed upon is not relevant. At the time Fort Pitt did become committed to a delivery date, it was aware that a June, 1970 performance was required by virtue of its own acceptance. There was no unilateral distortion of the agreement rendering Fort Pitt liable to an extent not theretofore contemplated.

Having proceeded thus far, we do not think it follows automatically that Torrington is entitled to recover the damages it seeks here; further consideration of the facts before us is warranted. Fort Pitt maintains that, under the Hadley v. Baxendale rubric, the damages flowing from its conceded breach are "special" or "consequential" and were not reasonably to be contemplated by the parties. Since Torrington has not proved any "general" or "direct" damages, Fort Pitt urges that the contractor is entitled to nothing. We cannot agree. It is commonplace that parties to a contract normally address themselves to its performance and not to its breach or the consequences that will ensue if there is a default. See J. Calamari & J. Perillo, supra, at 331; C. McCormick, supra, at 580; 11 S. Williston, supra, at 295. As the New York Court of Appeals long ago stated:

> [A] more precise statement of this rule is, that a party is liable for all the direct damages which both parties to the contract would have contemplated as flowing from its breach, if at the time they entered into it they had bestowed proper attention upon the subject, and had been fully informed of the facts. [This] may properly be called the fiction of law . . .

Leonard v. New York, Albany & Buffalo Electro-Magnetic Telegraph Co., 41 N.Y. 544, 567 (1870).[3]

---

3. A second fiction, added as an embellishment to Hadley v. Baxendale by Mr. Justice Holmes as federal common law in Globe Ref. Co. v. Landa Cotton Oil Co., 190 U.S. 540, 23 S.Ct. 754, 47 L.Ed. 1171 (1903), would require not only knowledge of the special circumstances but a tacit agreement on the part of the party sought to be charged to accept the liability imposed by the notice. This second test has generally been rejected by the courts and commentators. Krauss v. Greenbarg, 137 F.2d 569, 571 (3d Cir.), cert. denied, 320 U.S. 791, 64 S.Ct. 207, 88 L.Ed. 477 (1943); J. Calamari & J. Perillo, supra, at 331–32; 11 S. Williston, supra, § 1357.

It is also pertinent to note that the rule does not require that the direct damages must necessarily follow, but only that they are likely to follow; as Lord Justice Asquith commented in Victoria Laundry, Ltd. v. Newman Industries, Ltd., [1949] 2 K.B. 528, 540, are they "on the cards"? We believe here that the damages sought to be recovered were also "in the cards."

It must be taken as a reasonable assumption that, when the delivery date of June, 1970 was set, Torrington planned the bridge erection within a reasonable time thereafter. It is normal construction procedure that the erection of the steel girders would be followed by the installation of a poured concrete platform and whatever railings or superstructure the platform would require. Fort Pitt was an experienced bridge fabricator supplying contractors[4] and the sequence of the work is hardly arcane.[5] Moreover, any delay beyond June or August would assuredly have jeopardized the pouring of the concrete and have forced the postponement of the work until the spring. The work here, as was well known to Fort Pitt, was to be performed in northern New York near the Vermont border. The court below found that continuing freezing weather would have forced the pouring to be delayed until June, 1971.[6] Had Torrington refused delivery or had it been compelled to delay the completion of the work until the spring of 1971, the potential damage claim would have been substantial. Instead, in a good faith effort to mitigate

damages, Torrington embarked upon the crash program we have described. It appears to us that this eventuality should have reasonably been anticipated by Fort Pitt as it was experienced in the trade and was supplying bridge steel in northern climes on a project requiring a concrete roadway.

Torrington's recovery under the circumstances is not substantial or cataclysmic from Fort Pitt's point of view. It represents the expenses of unloading steel from the gondola due to Fort Pitt's admitted failure to notify its erection subcontractor, Syracuse Rigging, that the steel had been shipped, plus the costs of premium time, extra equipment and the cost of protecting the work, all occasioned by the realities Torrington faced in the wake of Fort Pitt's breach. In fact, Torrington's original claim of $23,290.81 was whittled down by the court below because of Torrington's failure to establish that its supervisory costs, overhead and certain equipment costs were directly attributable to the delay in delivery of the steel.

Professor Williston has commented:

The true reason why notice to the defendant of the plaintiff's special circumstances is important is because, just as a court of equity under circumstances of hardship arising after the formation of a contract may deny specific performance, so a court of law may deny damages for unusual consequences where the defendant was not aware when he entered into the con-

---

**4.** The president of Fort Pitt testified that "[w]e are specialists in the field of welded girder bridges." He also stated that Fort Pitt has a yearly capacity of 30,000 tons of bridge steel, or "over a hundred times the type of tonnage that is involved in this case." In any given year it ships steel for between 25 to 30 major bridge projects, and sells in the District of Columbia and six states, including New York. The president further testified that, prior to the contract for the Battenkill Bridge, Fort Pitt had sold steel to Torrington on two separate occasions: in the spring of 1968 for the St. Lawrence County bridge and in February, 1969 for the Clinton County bridge.

**5.** There was testimony that the process of construction of the bridge over the Battenkill

River was as follows: Torrington first placed a reinforced concrete pier approximately in the center of the River and then built abutments or additional piers on the edges of the River. The structural steel was then laid between the center pier and the abutment on each side. Later, the concrete deck, stone curbings and bridge rails were installed.

**6.** The contract specifications required that concrete be poured only when the temperature was at 40° Fahrenheit and above. The president of Fort Pitt testified at trial that, before his company quotes a price for steel to a general contractor, it obtains the state's specifications on the job in question, and that that was done in this case.

tract *how serious an injury would result from its breach.*

11 S. Williston, *supra,* at 295 (footnote omitted) (emphasis added).

In this case, serious or catastrophic injury was avoided by prompt, effective and reasonable mitigation at modest cost.[7] Had Torrington not acted, had it been forced to wait until the following spring to complete the entire job and then sued to recover the profits it would have made had there been performance by Fort Pitt according to the terms of its agreement, then we might well have an appropriate setting for a classical *Hadley v. Baxendale* controversy.[8] As this case comes to us, it hardly presents that situation. We therefore affirm the judgment below permitting Torrington to offset its damages against the contract price.

## II

The only other question raised on this appeal involves the computation of interest. The total contract price due to Fort Pitt was $132,274.73, payable 30 days from the date of invoice. The invoices rendered here required payment by Torrington on October 8, November 12 and December 30, 1970. Torrington made a partial payment of $60,000 on December 11, 1970 but refused to pay the balance. After Fort Pitt commenced suit against Aetna for the balance due

plus interest, Torrington paid $20,000 on February 4, 1972 and $28,983.92 on September 7, 1972. There is no question but that under the law of New York Fort Pitt is entitled to interest for the sums due under the subcontract. N.Y.C.P.L.R. § 5001(a); United States v. Walsh, 240 F.Supp. 1019 (N.D.N.Y.1965). The court below, by order dated December 12, 1973, denied Fort Pitt's motion to amend the judgment to reflect its entitlement to interest on late payments made in February and September, 1972, on the theory that this interest had not been demanded and that acceptance of partial payments without protest barred the interest award. Since interest was recoverable as a matter of law and since Fort Pitt had demanded interest in its counterclaim to Torrington's complaint, the right to interest cannot be considered to have been waived. Crane v. Craig, 230 N.Y. 452, 130 N.E. 609 (1921), relied upon below, held that, where interest is not payable by the terms of the contract but is allowable as a mere incident to it, receipt of the principal bars a subsequent claim for interest since the debt is extinguished by the payment of the principal. But here the payment was partial and did not extinguish the debt. The proper rule, set forth by this court in Ohio Savings Bank & Trust Co. v. Willys Corp., 8 F.2d 463, 466–67 (1925) (relying upon, *inter alia,* New York cases), is that when partial payments have been made,

---

7. It is well understood that expenses incurred in a reasonable effort, whether successful or not, to avoid harm that the defendant had reason to foresee as a probable result of the breach when the contract was made may be recovered as an item of damage flowing from the breach. Elias v. Wright, 276 F. 908, 910 (2d Cir. 1921); C. McCormick, *supra,* § 42; Restatement, *supra,* § 336(2).

8. In Hadley v. Baxendale a miller sought to recover the profits lost from the closing of the mill as a result of a carrier's failure to make timely delivery of a broken crank shaft to an engineering firm where it was to be used as a model for a replacement. A recovery of those profits was disallowed on the ground that it was not reasonably foreseeable that profits would be lost as a result of the breach of the contract of carriage. Lord Justice Asquith pointed out in Victoria Laundry, Ltd. v. Newman Indus., Ltd., *supra,* that the

headnote in Hadley v. Baxendale is misleading in stating that the clerk of the defendant carrier knew that the mill was stopped and that the broken shaft had to be delivered immediately. The *Victoria* court stated that the Court of Exchequer must have rejected this statement and decided to deny the loss of profits from the closing of the mill because the only knowledge possessed by the defendant was that the mill shaft was broken and that the plaintiffs were the millers. Otherwise, "the court must, one would suppose, have decided the case the other way round . . . ." [1949] 2 K.B. at 537. The misleading headnote, however, was considered to reflect the actual facts by at least two scholarly articles on the famous case. Bauer, Consequential Damages in Contract, 80 U.Penn.L. Rev. 687, 689 (1932); McCormick, Damages for Breach of Contract, 19 Minn.L.Rev. 497, 500 (1935).

the payment must be applied first to the interest then due, with the surplus discharging the principal *pro tanto*.

It seems to be conceded that the court below was in error in calculating the rate of interest at 7½% from November 12, 1970. By amendment of N.Y.C.P. L.R. § 5004 effective September 1, 1972, the rate was changed to 6%. Thus, the interest should be computed at these rates for the relevant periods.

We therefore remand this case to the district court to compute the interest in accordance with this opinion and further to enter amended and separate judgments against Torrington and Aetna.[9]

Affirmed in part, reversed in part and remanded. No costs.

---

**9.** Judgment was originally entered by the clerk, in conformity with the decision of the district court, against Torrington and Aetna. The judgment was later amended, and, in the order directing amendment, the court stated that Fort Pitt should recover from Torrington on its counterclaim the total amount due. A judgment to this effect was entered by the clerk. No mention was made in the order or the amended judgment of the obligation of Aetna. It is because of this confusion that we direct the entry of separate judgments against Torrington and Aetna.