Ferdinand **CINELLI** and Sarah M. Cinelli, Petitioners-Appellants,

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.**

No. 74–1090.

United States Court of Appeals, Sixth Circuit.

Argued June 5, 1974.

Decided Sept. 5, 1974.

William P. Thorpe, Detroit, Mich., for petitioners-appellants; McClintock, Donovan, Carson & Roach, Detroit, Mich., on briefs.

Harold J. Tulley, Tax Div., Dept. of Justice, Washington, D. C., for respondent-appellee; Scott P. Crampton, Asst. Atty. Gen., Meyer Rothwacks, Grant W. Wiprud, Attys., Tax Div. Dept. of Justice, Washington, D. C., on briefs.

Before PHILLIPS, Chief Judge, and CELEBREZZE and ENGEL, Circuit Judges.

## CELEBREZZE, Circuit Judge.

This case presents a single question of substantial significance to international commerce and United States taxation of its citizens' foreign income. That question is the proper means of giving foreign currency a United States dollar value when a foreign government's official rate of monetary exchange differs from the "free market" or "commercial" rate. Specifically, the issue is the proper measure of U.S. dollar value of real property priced in Italian lire on May 1, 1942. At that time Italy's official exchange rate was 19.1 lire to the dollar, whereas the free market (or black market) rate in Italy was from 600 to 800 lire to the dollar.

On May 1, 1942, Delfino Ferdinando Cinelli died, leaving his estate of Spannocchia to his wife and children.[1] Spannocchia is a large ancestral estate near Siena, Italy, of which Taxpayer[2] Ferdinand Cinelli received 1,194.71.44 hectares upon his father's death. For years one of Spannocchia's primary products was pigs, which foraged and fattened on chestnuts that fell from extensive groves on the estate. Chestnut-fed pigs brought high prices for their exceptional quality.

From 1963 to 1966, a blight killed nearly all Spannocchia's chestnut trees, and pig production plummeted as a direct result, with the farm sustaining substantial losses. Taxpayer asserted a loss incurred in his trade or business for 1965 in the amount of $10,000 from the trees' loss. The Commissioner asserted an equivalent deficiency, claiming that taxpayer had established no deductible loss as having occurred in 1965.[3] Taxpayer challenged the deficiency in the Tax Court.

After a trial in Detroit, a Tax Court Judge determined that Taxpayer had suffered a loss deductible under § 165(a), Int.Rev.Code of 1954, because of the chestnut blight. The Court ruled that of the 90% of the trees killed, 33% died in 1965, so that 30% of the trees' overall value was lost in that year. Under § 165(a), the allowable loss is the lesser of the adjusted basis of the property lost and the actual diminution in the property's value caused by the loss. In this case the lesser amount was the adjusted basis.

The Court held that 20% of Taxpayer's basis in Spannocchia was allocable to the trees, since the groves represented 20% of Spannocchia's value before the blight. It then turned to the question of Taxpayer's basis in Spannocchia on May 1, 1942 (when Taxpayer received his share of the estate). Under § 1014, Int.Rev.Code of 1954, the basis of property in the hands of a person inheriting it is the fair market value of the property at the time of the decedent's death. The Court adopted the figure of 4,814,000 lire as the fair market value of Spannocchia on the date, which was the amount Italian authorities set as the estate's fair market value for inheritance tax purposes. Although Taxpayer asserted at trial that his figure greatly understates the fair market value of the estate on May 1, 1942, Taxpayer has accepted the findings of the Tax Court, and we accept on appeal the figure of 4,314,000 Italian lire as the fair market value of Spannocchia on May 1, 1942.

1. The Tax Court Memorandum Decision sets forth extensive factual findings and is found at T.C.Mem. 1973–140, 32 CCH Tax Ct. Mem. 674 (1973).

2. The Cinellis filed a joint return, so that Mrs. Cinelli is joined as Petitioner-Appel-lant. The opinion refers to Mr. Cinelli alone as "Taxpayer".

3. Other adjustments to 1965 reported income are not involved in this appeal.

The next question faced by the Tax Court Judge was the proper method of translating 4,314,000 Italian lire on May 1, 1942, into a U.S. dollar value. The Judge found that the proper exchange rate was the "black market" rate, set at 719 Italian lire to the U.S. dollar, so that the value of Spannocchia was $6000 on May 1, 1942. Since Taxpayer owned half the estate in 1965, his basis in it was $3000. Twenty percent of that basis, or $600, was attributable to the chestnut groves. Since 30% of the trees were lost in 1965, the basis attributable to the trees lost in 1965 was 30% of $600, or $180. The Tax Court limited Taxpayer's deduction to this amount. Finally, the Tax Court upheld a $5,550 deficiency.

The sole issue raised on appeal is whether the Italian Government's official exchange rate or the commercial (black market) rate on May 1, 1942 should have been used to translate 4,314,000 Italian lire into U.S. dollars. If the official exchange rate of 19.1 lire to the dollar is used, Spannocchia was worth $225,864. If the commercial rate of 719 lire to the dollar is used, Spannocchia was worth $6,000.

■ Although we have found no direct Supreme Court or Sixth Circuit guidance on this question, the courts have been virtually unanimous in rejecting official exchange rates and in adopting commercial exchange rates as the proper media for translating foreign currency into U.S. dollar values.[4] Estate of Oei Tjong Swan, 24 T.C. 829 (1955); Hughes Tool Co. v. United Artists Corp., 279 App.Div. 417, 110 N.Y.S. 2d 383 (1st Dept. 1952); Estate of Jan Willem Nienhuys, 17 T.C. 1149 (1952);

Foundation Co., 14 T.C. 1333 (1950); Ceska Cooper, 15 T.C. 757 (1950), acq., 1951-1 Cum.Bull. 2; Estate of Anthony H. G. Fokker, 10 T.C. 1225 (1948); Morris Marks Landau, 7 T.C. 12 (1946); Edmond Weil, Inc. v. Commissioner of Internal Revenue, 150 F.2d 950 (2d Cir. 1945), aff'g 3 T.C. Mem. 844 (1944); Eder v. Commissioner of Internal Revenue, 138 F.2d 27 (2d Cir. 1943); Credit and Investment Corp., 47 B.T.A. 673 (1942). See Rev.Rul. 64–307, 1964–2 Cum.Bull. 163. We adopt this general rule, but proceed to examine the instant situation to determine whether it was properly applied here.

The United States taxes all income of its citizens, whether earned here or abroad. Treas. Reg. § 1.1–1(b) (1956); Cook v. Tait, 265 U.S. 47, 44 S.Ct. 444, 68 L.Ed. 895 (1924). In order to equalize a person's tax consequences regardless of where income is earned or losses are suffered, U.S. taxation is determined by the value of property as measured in U.S. dollars. This requires a translation of worth of foreign property from a foreign currency to a U.S. dollar value. The problem in this case was to arrive at a fair market value of the estate of Spannocchia in U.S. dollars on May 1, 1942, given a figure which represents the property's fair market value in Italian lire on that date.

■ Taxpayer had the burden of affirmatively establishing his case and of rebutting the fair market value of $6,000 which the Commissioner's exchange rate supported and which the Tax Court accepted. Corn Products Refining Co. v. Commissioner of Internal Revenue, 215 F.2d 513, 517 (2d Cir. 1954), aff'd, 350 U.S. 46, 76 S.Ct. 20,

---

4. See generally Raffel, "Some Tax Aspects of Foreign Currencies," 14 Tax L.Rev. 389, 407–09 (1959); Ravenscroft, "Taxation of Income Arising from Changes in Value of Foreign Currency," 82 Harv.L.Rev. 772, 790 (1969).

The Seventh Circuit recently reversed and remanded a decision of the Tax Court, in which a conflict had developed between a "basic buying rate" and the "commercial rate"

for Argentine pesos in 1950. Durovic v. Commissioner of Internal Revenue, 487 F.2d 36 (7th Cir. 1973), rev'g 54 T.C. 1364 (1970). Durovic is far different from our case, since neither the government nor taxpayer urged reliance upon the official exchange rate and since petitioners argued that the commercial rate was inappropriate because they had actually exchanged currency at a rate negotiated at arms' length.

100 L.Ed. 29 (1955); Edmond Weil, Inc. v. Commissioner of Internal Revenue, 150 F.2d 950, 952 (2d Cir. 1945). *See* 26 U.S.C. § 7453 (1967), Rule 32; Lenox Clothes Shops v. Commissioner of Internal Revenue, 139 F.2d 56 (6th Cir. 1943); Bank of America Nat. Trust & Savings Ass'n v. Commissioner of Internal Revenue, 126 F.2d 48 (9th Cir. 1942); Mahler v. Commissioner of Internal Revenue, 119 F.2d 869 (2d Cir.), cert..denied, 314 U.S. 660, 62 S.Ct. 114, 86 L.Ed. 529 (1941). Taxpayer had the burden of showing not only that he was entitled to a deduction, "but also the amount to which he was entitled." Helvering v. Taylor, 293 U.S. 507, 514, 55 S.Ct. 287, 290, 79 L.Ed. 623 (1935).

■ He might have done this by showing a 1942 offer to buy Spannocchia with U.S. dollars in an amount greater than $6,000. This would have been an ideal means of establishing how many U.S. dollars the estate was actually worth. Because of wartime conditions and the restrictions which the Italian Government had clamped on exchanges of foreign currency, probably no holder of U.S. dollars would have used them to purchase Spannocchia at that time. No such offer was shown to have been made. A purchase with U.S. dollars would have forced an exchange of $1.00 for 19.1 lire, at a time when up to 800 lire could be obtained for $1.00 on the black market. A holder of U.S. dollars would have been reluctant to exchange his dollars for lire at the official rate, since it severely depressed the actual purchasing power of his U.S. currency. In fact, Taxpayer himself refused to accept and cash several checks sent from the United States to his residence in Italy, because the official exchange rate would have dissipated most of the checks' actual value.

This explains the inappropriateness of Italy's 1942 official exchange rate as a true measure of the wartime worth of U.S. dollars. Holders of U.S. currency would not have exchanged them at that rate, except under very unusual circumstances. And holders of Italian lire could not have made the beneficial exchange at Italy's official rate. As the Tax Court found, "It would have been very difficult, if not impossible, to convert lire into dollars at the official rate." [5] 32 CCH T.C. Mem. at 675. The official Italian exchange rate had no relationship to actual value.

Indeed, the very institution of official exchange rates which differ from commercial rates is based on governments' collateral motives—to expand or contract exports and imports, to encourage or discourage foreign investment, and to control the flow of foreign currency into and out of a country, among other objectives.[6] These purposes are divorced from considerations of actual purchasing power of a currency, which is the basic criterion for determining the U.S. dollar worth of property priced in a foreign currency. Official exchange rates are seldom proper measures of the actual U.S. dollar value of foreign currency or property.[7]

To arrive at the fair market value of Spannocchia in U.S. dollars on May 1, 1942, a measure other than Italy's official exchange rate was needed. The normal method is to apply the free market or "commercial" rate established in New York's financial centers on the date in

5. This fact is sufficient to dispose of Taxpayer's "alternative" argument that if the official rate is not used, then "the official valuation for Italian tax purposes should be reassessed upwards by the difference of official rate of exchange used by the Court (719 lire to the dollar), or a multiple of 37.64." This would be valid only if Taxpayer's lire could actually have been exchanged at the official rate. As the Tax Court found, no such exchange could have been made.

6. *See* Ravenscroft, *supra* n. 4; Raffel, *supra* n. 4.

7. In a rare case the official rate might be the proper measure. *See e. g.*, S. E. Boyer, 9 T.C. 1168 (1947) (where the taxpayer had been forced to exchange currency at the official rate); Waterman's Estate v. Commissioner of Internal Revenue, 195 F.2d 244 (2d Cir. 1952) (where the taxpayer did not contest application of the official rate, though it was applied to his detriment).

question. *See* Raffel, *supra* n. 4, 407–08. This rate is a proper measure of how many U.S. dollars a particular unit of foreign currency actually purchases in arms' length transactions. It measures actual market value, real purchasing power, of one currency in terms of another.[8] This rate is, furthermore, legislatively prescribed as the measure of the value of imported merchandise, under 31 U.S.C. § 372(c).[9] It would be remarkable for this Court to approve the use of an official exchange rate in contrast to the commercial rate which Congress has mandated as the measure to be applied in customs determinations. The customs formula is the product of a long history of congressional development, and "the formula finally selected is dependent on the actual value of the foreign currency in our money." Barr v. United States, 324 U.S. 83, 89, 65 S. Ct. 522, 525, 89 L.Ed. 765 (1945).

 In this case no New York commercial rate was made available to the Tax Court, so it looked to the Italian black market rate, which the Commissioner had shown to have fluctuated between 600 and 800 lire to the U.S. dollar in 1942. This rate, which was based on actual dollar-lire transactions in Italy during 1942, indicates the fair market value of U.S. dollars in Italian lire. It does so by recording how individuals bargained at arms' length over the worth of lire and dollars. It is a rough but adequate measure of the fair market value of U.S. dollars in Italian lire. It makes sense as a measure of actual value because a person in Italy in 1942 would have paid $1.00 for the same commodity for which he would have paid 600·to 800 lire. Thus, if 4,314,000 Italian lire was Spannocchia's fair market value in 1942, then the property's value in U.S. dollars was from 1/600 to 1/800 of this figure. The Tax Court used an exchange rate of 719 lire to the dollar, presumably in order to arrive at the round figure of $6,000 as Spannocchia's fair market value (4,314,000 divided by 719 equals 6,000). This figure is within the range of 600 to 800 lire to the dollar which the evidence supports. The lack of a precise rate redounds to Taxpayer's detriment, since it is his burden to show a more accurate rate than that adopted by the Commissioner and by the Tax Court. Corn Products Refining Co. v. Commissioner of Internal Revenue, *supra*; Edmond Weil, Inc. v. Commissioner of Internal Revenue, *supra*. The Tax Court was correct in arriving at some reasonable figure as the exchange rate, so as to give Taxpayer credit for a deduction the right to which he had established, even though he could not prove a particular amount to which he was entitled. Cohan v. Commissioner of Internal Revenue, 39 F.2d 540 (2d Cir. 1930).

The decision of the Tax Court is affirmed, with each party to bear its own costs.

8. The New York commercial rate is not a perfect measure of the value in U.S. dollars of particular property with a foreign currency price. As pointed out in Ravenscroft, *supra* n. 4, free market forces in international currency exchange do not always perform as theory would dictate. Nonetheless, commercial rates are an available and roughly accurate measure of purchase power equivalence, and in the absence of a better indication of the actual U.S. dollar value of foreign property, they are usually the best available yardstick.

9. Under 31 U.S.C. § 372, the New York commercial rate is the rate applied for customs purposes, unless a proclaimed official rate of the U.S. Secretary of the Treasury differs less than 5% from the commercial rate.