AERO RENTAL, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4231-72. Filed May 29, 1975.

---

*William L. Raby,* for the petitioner.
*Harold E. Patterson,* for the respondent.

SIMPSON, *Judge:* The Commissioner determined the following deficiencies in the petitioner's Federal corporate income taxes:

| Year | Deficiency |
|------|-----------|
| 1968 | $3,362.96 |
| 1969 | 15,341.11 |
| 1970 | 15,541.76 |

Some of the issues in the case have been settled, and one issue is to be tried subsequently, if necessary. The issues to be decided at this time are: (1) Whether the petitioner's stock bonus plan was communicated to its employees during 1969; and (2) whether under the circumstances, the plan qualified under section 401 of the Internal Revenue Code of 1954 [1] for the years 1969 and 1970.

### FINDINGS OF FACT

Some of the facts have been stipulated, and those facts are so found.

The petitioner, Aero Rental (Aero), is an Arizona corporation with its principal offices in Tucson, Ariz., at the time of filing the petition in this case. It filed its returns on the calendar year basis, using the accrual method of accounting. Its Federal corporate income tax returns for the years 1968, 1969, and 1970 were filed with the Director of the Western Service Center, Ogden, Utah.

Aero was owned and operated by the Hoxie family. Thomas M. Hoxie (T. M. Hoxie) and his wife owned all of Aero's class A stock and were its only directors. He was also Aero's president. Thomas M. Hoxie III (Tom Hoxie) is T. M. Hoxie's son. He owned 95 shares of the class B stock and was Aero's general manager.

In early December 1969, T. M. Hoxie directed his financial adviser to draft a stock bonus plan for Aero's employees. His objective was to establish a plan which would provide benefits for

---

[1] All statutory references are to the Internal Revenue Code of 1954 as in effect for the years at issue, unless otherwise indicated.

the employees and thereby encourage them to remain with Aero. Shortly thereafter, a stock bonus plan was drafted and sent to him on December 16, 1969. After work that day, an informal meeting of the employees was held at which they were told of the plan, but the discussion of its details was deferred to a dinner meeting to be arranged as soon as possible.

Thereafter, Tom Hoxie typed a memorandum to Aero's employees. It provided in part:

And now * * * pending the approval of the Internal Revenue Service * * * we are going to set up a long range profit sharing pension plan.

Most of you are already qualified for the plan and have been included in it for 1969. The average amounts that have been vested in your individual accounts (those of you that qualify) is approx. $1200.00 each. Among other things necessary for qualifying for the plan is length of service with Aero. For those of you not yet qualified, you will be either this year or next year.

We will have a company meeting this THURSDAY evening, time and place to be announced later, to go over the plan and discuss it with you.

Although the memorandum was dated December 28, 1969, it was prepared and distributed to the employees on December 17, 1969.

On the following day, December 18, Aero held a dinner meeting attended by all 11 of its employees. At the meeting, the plan was read and explained, and estimated benefits were discussed. The employees were given the opportunity to raise any questions they had about the plan. Copies of it were not given to the employees, nor were any written summaries provided; but the employees were told that they could read the plan at any time.

On December 24, 1969, Aero's board of directors adopted a resolution approving the plan and directed that a contribution of $100 be made immediately to the trustees under the plan. The following resolutions were also adopted:

RESOLVED, that the Class B. stock of Aero Rental be issued in accordance with the stock bonus plan and trust agreement. It shall have a par value of One Hundred Dollars ($100.00) per share. Any Class B stock issued by the corporation may be redeemed by the corporation at any time, upon thirty days notice, at the book value thereof.

FURTHER RESOLVED, that the said Class B stock shall provide that the holder of such stock after receiving a bona fide offer to purchase such stock shall, before transferring or selling such stock, give written notice by registered mail to the corporation of the price and terms of such transfer or sale and the corporation shall have thirty days after the receipt of such notice to notify the holder of such stock whether it will redeem such stock. If the corporation does

not agree to redeem such stock the holder of such stock may sell such stock to the third person making such offer, who shall likewise be bound by this restriction upon the transfer of the stock to him. If the transferor shall fail to make such transfer within thirty days following the expiration of the time hereinabove provided for the election by the corporation, then the holder of such stock shall then become subject to the restriction herein provided.

The board also directed that a contribution of class B stock, which it valued at $14,900, be made to the trustees of the plan prior to March 1, 1970; such contribution was in fact made.

The plan was to be effective immediately. It was to cover all employees who worked more than 20 hours per week for more than 5 months in a year, and who had at least 3 years service with Aero. On December 31, 1969, 8 of its 11 employees were eligible to participate; the other employees would become eligible within the next year or two, if they remained with Aero.

An employee's rights to benefits under the plan vested at the rate of 10 percent for each year of participation. The benefits were distributable as follows:

(a) Each participating employee, or his beneficiary, shall be entitled to distribution of the vested portion of his separate account in full upon his death, disability, or attainment of age sixty-five. He shall be entitled to receive this distribution in the form of stock of the corporation. * * *

The plan declared that the parties to it understood that it was intended to qualify as a stock bonus plan under section 401. The plan also provided that if Aero's initial contribution was not deductible under section 404, it should be returned to Aero and that any amendment to the plan required in order to enable it to qualify under section 401 could be made applicable retroactively.

In June 1970, Aero submitted to the District Director of Internal Revenue, Phoenix, Ariz., an application for a determination that the plan qualified under section 401. T. M. Hoxie, as president of Aero, signed the application. Question 15 on the application was answered as follows:

Date communicated to employees _____ January, 1970
How communicated?_____ Employee meeting

Several objections to the plan were raised by the internal revenue agent who reviewed the application. When Aero was advised of those objections, it quickly amended the plan in August 1970 to eliminate such objections. However, before the amended plan was approved, a second agent was assigned to the matter, and he raised new objections.

Aero's representative did not agree with the agent and took the matter up with the national office of the Internal Revenue Service. Yet, when, on May 10, 1971, the national office affirmed the position taken by the agent, Aero, on July 1, 1971, amended the objectionable provisions to make them acceptable to the agent. The amendments provided that distributions from the plan must be made in the form of Aero class B stock and that the normal retirement age was 65, or after 10 years of service with Aero, if that occurred after age 65. In addition, the redemption clause of the class B stock was changed to provide that if a shareholder received a bona fide offer to purchase his stock, Aero could repurchase the stock on the same terms as the offer if it so elected. A favorable determination was then issued on July 15, 1971, stating in part that the plan was qualified for taxable years ending after December 31, 1970.

None of Aero's employees terminated their employment with it for any reason during 1969 or 1970. As a result, no distributions were made from the plan during those years. The first terminations did not occur until 1973.

Based on its contributions to the plan, Aero deducted $15,000 for 1969 and $18,313.49 for 1970. In his notice of deficiency, the Commissioner disallowed those deductions because "it has been established that the plan in actual operation has not met the requirements of Section 401(a)." In its petition, Aero alleged that the plan in actual operation was qualifed, and in his original answer, the Commissioner merely denied that allegation. His answer was later amended to provide that for 1969 and 1970, the plan was not qualified in form or operation because of the failure to communicate it to the employees in 1969, because of the restriction on the marketability of the stock, because of the lack of full vesting of an employee's rights when he reached retirement age, and because of the failure to include a requirement that the distributions be in stock of the employer. The Commissioner subsequently amended his answer a second time to allege that the petitioner's deduction should be disallowed for the alternative reason that the fair market value of the class B stock contributed by Aero was less than the amount claimed by it. Aero's motion to sever that issue has been granted, and it will be tried subsequently, if necessary.

OPINION

The Commissioner has conceded that he bears the burden of proof on the new issues raised in his amended answers. See Rule 142(a), Tax Court Rules of Practice and Procedure. We consider first the issue of whether the plan was communicated to Aero's employees in 1969.

Section 1.401-1(a)(2) of the Income Tax Regulations provides in part:

(2) A qualified pension, profit-sharing, or stock bonus plan is a definite written program and arrangement which is communicated to the employees * * *

The Commissioner contends that a plan is not qualifed under section 401 until it is communicated to the employees and that the Aero plan was not communicated to its employees in 1969. See Rev. Rul. 72-509, 1972-2 C.B. 221. He also argues that a plan must be communicated to the employees either (a) by providing them with a written copy of the plan, or (b) by furnishing them with a written summary, or posting a written notice giving them certain pertinent information, and by announcing when and where the plan may be examined by them. See Rev. Rul. 71-90, 1971-1 C.B. 115. He asserts, in the alternative, that such requirements were not met in this case. Aero admits that communication is required but contends that it occurred in 1969 or that, in the alternative, it need not take place prior to the qualification of the plan. Since we have found that there was adequate communication of the Aero plan to its employees in 1969, we do not reach the alternative argument.

Aero was a closely held corporation with 11 employees in 1969. T. M. Hoxie, the president and principal shareholder, and Tom Hoxie, the general manager, worked closely with the other employees. As soon as they received a draft of the plan, they met informally with the employees after work to discuss it. A more thorough discussion of the plan was scheduled for a dinner meeting to be held shortly thereafter.

On the day after the informal meeting, a memorandum by Tom Hoxie was distributed to the employees, giving them certain information about the plan and indicating that it would be discussed thoroughly at a dinner meeting to be held on the following Thursday. Although the memorandum was dated December 28, 1969, we have found that it was prepared and

distributed on December 17. of that year. Tom Hoxie testified that the date on the memorandum was a typographical error. December 28, 1969, was a Sunday, and he also testified that he did not work on Sundays. In addition, the following Thursday was the first of January, and it is unlikely that an employee meeting would have been scheduled for that day. Furthermore, we are satisifed that the dinner referred to in the memorandum actually took place on December 18, 1969. Aero submitted a receipt, indicating that it had paid for dinners for 11 people on December 18, 1969, and an affidavit of 6 of its employees stating that there was a dinner meeting of the employees a few days before Christmas at which the plan was read and discussed.

The memorandum stated that each employee's account would receive approximately $1,200. At the dinner meeting, the plan was first read to the employees and then explained to them. The Hoxies went over the plan paragraph by paragraph to answer any questions raised by the employees. While no copies were distributed to the employees, they were told that they could read the plan at any time.

In our judgment, these arrangements were sufficient to communicate the plan to the employees in 1969. The informal meeting, the memorandum, and the dinner meeting—all took place in 1969. In some situations, adequate communication might require more formal procedures, such as those set forth in Rev. Rul. 71-90, *supra,* but the procedures adopted by the Hoxies were sufficient to inform Aero's employees. When there are only a few employees, as in this case, it may be practicable and adequate to have informal meetings to discuss the plan, to read the plan to the employees and discuss their questions with them, and to announce merely that the plan can be examined by anyone at any time without laying down specific conditions for the examination. A copy of the plan or a written description of it might have been helpful to an employee, but we cannot say that either was essential to the employees acquiring an understanding of the plan; nor are we inclined to hold that the plan fails to qualify merely because the employees were not provided with written information.

The Commissioner contends that the petitioner has admitted in its application for a determination that the plan was not communicated to its employees until 1970. However, T. M. Hoxie testified that when he completed the application, he did

not consult his records to check the actual date of the meeting; he did not realize then that the date of the meeting was crucial. Moreover, any doubt as to the date of the employee meeting raised by the application is rebutted by the testimony of the Hoxies, the documentary evidence presented by them, and the affidavit of the petitioner's employees.

In his brief, the Commissioner also argues that the petitioner could not accrue a liability in 1969 for its contribution to the plan because the precise amount of the contribution was not communicated to the employees at that time. See Rev. Rul. 71-38, 1971-1 C.B. 130. Such issue was not raised in the notice of deficiency, the answer, the amended answers, or the opening statements. Whether the petitioner could accrue a liability in 1969 for the contribution to the plan is a separate and distinct issue from the question of whether the plan was properly communicated to the employees. Issues raised for the first time by brief are not properly before us. See *Aubrey S. Nash*, 31 T.C. 569 (1958); *Theatre Concessions, Inc.*, 29 T.C. 754 (1958). Thus, we do not consider this argument. The Commissioner had numerous opportunities to raise this issue, but failed to do so; by not doing so, he has waived it.

Next, we turn to a consideration of the Commissioner's objections to the provisions of the plan. He contends that the original provisions of the plan did not meet the requirements of section 401(a) and that the 1971 amendments were too late to enable it to qualify for 1969 and 1970. The petitioner, on the other hand, argues that the plan's original provisions did satisfy the requirements of section 401, or if not, that its amendments retroactively qualified it. In the light of the circumstances of this case, we hold that the plan qualified for 1969 and 1970; we do not pass on whether the original provisions of the plan qualified under section 401.

The position adopted by the Commissioner in this case would frustrate the reasons for granting special treatment for employee pension, profit-sharing, annuity, and stock bonus plans, and if that position were applied universally, its impact would be widespread. The legislation seeks to encourage the establishment of nondiscriminatory plans for employees by allowing an employer to deduct his contributions to them, by exempting the income earned by the plans, and by deferring the taxation of an employee's rights until he actually receives distributions under

the plan. Secs. 401, 402, 403, 404, and 501(a); H. Rept. No. 2333, 77th Cong., 2d Sess. (1942), 1942-2 C.B. 372, 413, 450-451. Yet, the statutory rules for the qualification of such plans are general, and even the provisions of the regulations do not provide specific guidelines. Before an employer proceeds to make substantial contributions to a plan, it needs to be assured that the plan meets the requirements for qualification. H. Rept. No. 93-807, 93d Cong., 2d Sess. 105-106 (1974); S. Rept. No. 93-383, 93d Cong., 1st Sess. 112 (1973). As a result, it is customary for an employer to request a determination that the plan is qualified. See Rev. Proc. 72-6, 1972-1 C.B. 710.

Frequently, there arise differences of opinion as to whether a proposed plan meets the qualification requirements. To secure a favorable determination, the employer may immediately agree to amend the plan to eliminate the objections raised by IRS. H. Rept. No. 93-807, *supra* at 106; S. Rept. No. 93-383, *supra* at 112-113. However, if the employer wishes to appeal the agent's decisions, there are established procedures under which it may obtain a review of those decisions within the IRS. Rev. Proc. 72-6, *supra,* 1972-1 C.B. at 712-713. Even when the employer amends the plan without exercising its right to review, some time is required to present the plan for a determination, to secure the views of the reviewing officer, and to amend the plan to avoid any objections. When the employer does seek national office review, even more time is required to secure a determination.

The facts of the present case illustrate the time required to secure a favorable determination. Aero clearly proceeded with due diligence to secure a determination for 1970. The plan was actually established before the beginning of that year; the determination was requested in the sixth month of the year; and yet, Aero did not learn definitively of the IRS position until May 10, 1971. Once it was advised of the IRS position, it promptly amended the plan and then secured a favorable determination on July 15, 1971—by which time the Commissioner says it was too late for the plan to qualify for 1970. Although Aero's conduct with respect to 1969 is subject to more criticism—it did not adopt the plan until the final month of the year and did not seek a ruling until the sixth month of the following year, those delays are not excessive, and it is questionable whether the plan should be denied qualification for 1969 merely because of such delays.

As in this case, an employer may find that his efforts to comply with the law have taken so much time that it is too late for the plan to qualify from the time of its creation, if we sustain the position now asserted by the Commissioner. Such a result seems incompatible with the reasons for the enactment of sections 401 through 404. If the plan is held not to qualify from the outset, the employees are likely to suffer more than the employer. The employer will forego its deduction, but its contribution will probably be refunded, since most plans provide for a refund of contributions if the plan is held not to qualify. Thus, the real losers are the employees who will receive no benefits for the years for which the plan is held not to qualify.

Moreover, the provisions to which the Commissioner objects never had any effect in this case. He objected to the provision under which a distributee's stock would have been subjected to a restriction on marketability, but no employees received any distributions in 1969, 1970, or 1971 prior to the amendment of the provision; thus, no employee actually ever received any stock subject to the restriction. Another objection was based on the fact that an employee might become age 65 and be eligible to retire, although his rights would not then be fully vested, but no employee reached that age prior to the amendment of the provision. His third objection was to the provision under which it was not altogether clear that a distributee would receive Aero stock, but that provision was also amended before any employee became entitled to receive such stock. The Commissioner urges us to hold that this plan was not qualified for 1969 and 1970 because of provisions which were once in the plan, but which have been removed and never had any effect while they were in the plan.

In this case, we heard evidence and argument over whether the Commissioner had a practice of giving retroactive effect to amendments of plans in situations like the present one. The petitioner established that in approximately one-half of the determinations issued by the Phoenix office in similar situations in the years 1969 through 1971, the determination held the plan was qualified for the earlier years. The Commissioner argued that such fact did not reflect a deliberate policy but was merely due to the workload and the use of inexperienced personnel; nonetheless, those reasons, even if true, may well exist in other

places and at other times and may lead to similar results. Thus, we are not dealing with an isolated situation.

The Commissioner attempts to justify his position by relying on section 401(b), which provided:

(b) CERTAIN RETROACTIVE CHANGES IN PLAN.—A stock bonus, pension, profit-sharing, or annuity plan shall be considered as satisfying the requirements of paragraphs (3), (4), (5), and (6) of subsection (a) for the period beginning with the date on which it was put into effect and ending with the 15th day of the third month following the close of the taxable year of the employer in which the plan was put in effect, if all provisions of the plan which are necessary to satisfy such requirements are in effect by the end of such period and have been made effective for all purposes with respect to the whole of such period.

He argues that such provision is exclusive and that no other amendments of plans are to be given retroactive effect for purposes of determining whether they qualify under section 401(a). However, in our opinion, such a restrictive rule is neither required nor intended by section 401(b). It was intended merely as a "safe harbor" provision. Compare sec. 302(b)(2) and (3); *United States v. Davis*, 397 U.S. 301, 310 (1970). Any amendment which does meet the conditions of section 401(b) is given retroactive effect, without regard to any other circumstances. When the predecessor of section 401(b) was enacted, there was no indication that Congress considered the possible existence of circumstances in which a determination is requested and more time is required to work out the necessary amendments of the plan. See H. Rept. No. 2017, 78th Cong., 2d Sess. 2 (1944); S. Rept. No. 1355, 78th Cong., 2d Sess. 1-2 (1944).

Moreover, after this case was tried and briefed, section 401(b) was amended by section 1023 of the Employee Retirement Income Security Act of 1974. 88 Stat. 829, 943. It now provides:

(b) CERTAIN RETROACTIVE CHANGES IN PLAN.—A stock bonus, pension, profit-sharing, or annuity plan shall be considered as satisfying the requirements of subsection (a) for the period beginning with the date on which it was put into effect, or for the period beginning with the earlier of the date on which there was adopted or put into effect any amendment which caused the plan to fail to satisfy such requirements, and ending with the time prescribed by law for filing the return of the employer for his taxable year in which such plan or amendment was adopted (including extensions thereof) or such later time as the Secretary or his delegate may designate, if all provisions of the plan which are necessary to satisfy such requirements are in effect by the end of such period and have been made effective for all purposes for the whole of such period.

Section 1024 of ERISA provides that the amendment of section 401(b) "shall take effect on the date of the enactment of this Act." 88 Stat. 943. Thus, the revised version of section 401(b) was not limited to rulings requested thereafter, nor to ruling requests then pending. The effective date provision is broad enough to make the revised version applicable to rulings already granted.

The amendment was made in order to allow remedial changes in a plan to be cured retroactively within such time as designated by the Secretary of the Treasury or his delegate. The report of the Ways and Means Committee stated: "It is expected that the regulations will provide for extension for reasonable cause, such as the filing of a bona fide request for a determination by the Service that a plan or plan amendment is qualified." H. Rept. No. 93-807, 93d Cong., 2d Sess. 166 (1974); see also S. Rept. No. 93-383, 93d Cong., 1st Sess. 147 (1973). We have afforded the Commissioner an opportunity to exercise his authority under section 401(b) as amended, but he has declined to do so. This refusal is contrary to the clear congressional intent in amending section 401(b). The Commissioner's refusal cannot be justified on the ground that the ruling was requested and granted before the enactment of the revised version of section 401(b).

Here, we have compelling reasons for holding this plan qualified for the years in issue: The employer brought the plan to the attention of IRS—there was no withholding of information—and sought the views of IRS as to whether the plan qualified. It certainly acted with due diligence so far as 1970 was concerned, and although it could have acted more promptly with respect to 1969, its conduct was still within the realm of reason. Once it ascertained the definitive views of IRS, it amended the plan so as to eliminate the objectionable provisions, and no one benefited by reason of the temporary existence of those provisions. An adverse holding would primarily penalize the employees. To deny the plan qualification under these circumstances would frustrate the purposes of section 401, and accordingly, we hold that under such circumstances, the plan did qualify for the years 1969 and 1970.

Reviewed by the Court.

*An order will be entered restoring this case to the general docket for trial or other disposition of the remaining issue.*

TANNENWALD, *J.*, concurring: I think it important to note that the majority opinion is directed toward the specialized area of employee pension, profit-sharing, and stock bonus plans and that none of the preamendment provisions of the plan became operative in respect of the rights of any employee. Within these, narrow confines, I agree with the result the majority reaches herein.

DRENNEN, SCOTT, and STERRETT, *JJ.*, agree with this concurring opinion.

QUEALY, *J.*, dissenting: In its opinion, the majority has, in effect, relied on section 401(b), as that section was amended by the Employee Retirement Income Security Act of 1974 (Pub. L. 93-406), to determine the qualification of a plan for the taxable years ending December 31, 1969 and 1970. I can find no indication or any intent on the part of the Congress that the 1974 Act should thus be applied retroactively either from a reading of the statute itself or the reports of the respective committees. This Court is extending that Act beyond the intent of the Congress solely to achieve what the Court deems to be a desirable result. With this, I am in disagreement.