COMPREHENSIVE DESIGNERS INTERNATIONAL, LTD., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 8956-72.    Filed May 26, 1976.

*C. VanLeer Davis III* and *Anthony L. Bartolini,* for the petitioner.
*Alan E. Cobb,* for the respondent.

TANNENWALD, *Judge:* The respondent determined the following deficiencies in petitioner's Federal income taxes:

| TYE APR. 30— | Deficiency |
| --- | --- |
| 1967 | $168,077.53 |
| 1968 | 156,568.00 |

Two issues require consideration: (1) Whether a downward adjustment should be made to the foreign tax credit claimed by petitioner for the taxable year ended April 30, 1967, and (2) whether petitioner is entitled to deductions for payments it made under a pension arrangement for its United Kingdom employees for the taxable years ended April 30, 1967, and April 30, 1968 (hereinafter fiscal 1967 and fiscal 1968, respectively).

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Petitioner is a corporation organized under the laws of Delaware. It filed its Federal income tax returns for the fiscal years ended April 30, 1967, and April 30, 1968, with the District Director of Internal Revenue, Philadelphia, Pa.

At all relevant times, petitioner had its principal office at Philadelphia, Pa., and engaged primarily in the operation of an aircraft design facility in the United Kingdom at Southall,

Middlesex, England. It maintained its books and records in terms of pounds sterling.

For fiscal 1967, petitioner accrued a liability of 233,630 pounds, 2 shillings, sixpence (£233,630.2.6) for income taxes payable to the United Kingdom. On its Federal income tax return for such year, petitioner translated this liability into dollars at the rate of exchange prevailing on April 30, 1967, in order to claim the foreign tax credit. At that date, both the official and commercial rates of exchange for the pound sterling were $2.80. At the date of payment of the liability, the prevailing official rate of exchange for the pound sterling was $2.40 and the commercial rate of exchange was $2.3835.

Sometime prior to August 19, 1966, petitioner determined to inaugurate a private pension plan for its United Kingdom employees; the plan was to go into effect October 1, 1966. Petitioner announced its intention to its employees on or about August 19, 1966, and distributed to such employees booklets describing the proposed plan about the same time. Since the envisioned plan was to be in lieu of part of the government-operated graduated pension plan under the United Kingdom National Insurance Act, petitioner notified the United Kingdom Office of the Registrar of Non-Participating Employments of its intent to "contract out" of the State scheme for those employees to be covered by the private plan. That office on October 24, 1966, certified petitioner's plan as meeting the requirements for nonparticipating employments which include the provision of pension benefits at least equivalent to those provided by the State scheme. Such certification was effective October 3, 1966.

On September 26, 1966, petitioner executed an Interim Trust Deed (hereinafter interim deed) in which it appointed three trustees to receive, hold, invest, and otherwise administer trust funds consisting of petitioner's contributions to the pension plan. Annexed to the interim deed was a copy of the booklet, signed by the trustees "for identification," which had been distributed to petitioner's employees and which described the terms of the plan. The purpose of executing the interim deed was to establish the pension arrangement pending approval thereof by the Superannuation Funds Office of the United Kingdom Inland Revenue Service for favorable tax consequences under the United Kingdom Income Tax Act of 1952. The application for such approval was made on September 29, 1966, by submitting a copy

of the interim deed with the descriptive booklet annexed as aforesaid. On September 26, 1969, prior to receiving Inland Revenue approval, petitioner executed a Definitive Trust Deed (hereinafter definitive deed or definitive deeds) which contained detailed provisions relating to contributions by petitioner and benefits to its employees, effective as of October 1, 1966. By letter dated October 15, 1970, Inland Revenue approved petitioner's pension arrangement [1] for favorable tax consequences, effective October 1, 1966.

According to the interim deed and attached booklet,[2] the plan called for the establishment of a pension fund and a provident fund, both of which were to be invested in pension contracts issued by the Clerical, Medical, and General Life Assurance Society. Petitioner was to make all necessary contributions to the plan; the employees were required to make no contributions. The pension fund would be the source for annuities, and the provident fund the source for cash sums to which employees became entitled under the plan. Subject to minimum and maximum age requirements, the interim deed recited that the funds were "for the benefit of certain of the employees and full time salaried directors of the Company" and of any "associate or subsidiary company"; certain supervisory personnel who were ordinarily United States residents and an insignificant number of other employees who were not United Kingdom residents were not covered.[3] The booklet described the plan as providing for benefits payable upon normal retirement, early retirement under certain circumstances, and termination of employment for disability under certain circumstances.

---

[1] The record does not reveal when a copy of the proposed definitive deed was submitted to Inland Revenue.

[2] The interim deed, by itself, was merely a seven-page document establishing the trust. A description of the rights of the employees to join the plan and accrue pension benefits appears in question-and-answer form in the annexed booklet.

[3] The booklet described membership in the plan thusly:

2. *Who may join?*

All members of the permanent staff of the Company who are normally resident in the United Kingdom are eligible to join the Scheme provided that they, being male, have passed their 20th but not their 60th birthdays, or, being female, have passed their 24th but not their 55th birthdays.

\* \* \*

3. *When may I join?*

Provided you satisfy the above conditions on 1st October, 1966 you may join the Scheme on that date.

Subsequently, employees will join the Scheme on the 1st October immediately following the date on which they satisfy the above conditions.

Plan benefits, as so described, were to be determined on the basis of a uniform percentage of an employee's "final pensionable salary" (highest average annual compensation over a 3-year period within the 10 years immediately preceding retirement) multiplied by the employee's number of years of service.[4] Benefits were to be subject to a maximum annual compensation and subject to an offset for an approximation of amounts receivable by the employee pursuant to the government-operated pension scheme. A minimum pension was also to be provided.

The covering letter at the beginning of the booklet stated that, in order to join the plan, eligible employees were to complete an application and submit it not later than September 16, 1966.

The booklet also provided that:

13. *What is the position regarding the State Graduated Pension Scheme?*
Contributions to the State Graduated Pension Scheme are in two parts:

(A) a percentage of earnings between £9 and £18 a week and (B) a further percentage of earnings between £9 and £30 a week. The contributions under (B) which commence on 3rd October, 1966, are designed partly to cover the supplements to unemployment and sickness benefit.

Both the (A) and (B) contributions earn graduated pension. Members' (B) contributions will be unaltered. All members of the Scheme, however, will be contracted out of paying (A) contributions although they will, as a result, pay slightly more for their National Insurance Stamp.

Naturally, no further pension benefits will be earned in the State Graduated Pension Scheme in respect of the (A) contributions.

The Scheme ensures that members are guaranteed in all circumstances a pension on retirement at normal retirement date at least as large as the pension they could have earned in the highest grade of the State Graduated Scheme in respect of (A) contributions. At present this amounts to £3. 9. 7d. a year (males) or £2.18. -d. a year (females), for each year of contracted-out service as a member of the Scheme (and proportionately for shorter periods). It is referred to throughout this explanation as the "Minimum Pension."

14. *What happens if I leave service before my normal retirement date?*
If you leave service for any reason whatsoever, you will always be entitled to a "frozen" pension equal to the Minimum Pension. This pension will be provided either by the payment of a cash sum to the State Scheme or by preservation in the Pension Fund.

In addition, if you leave service for any reason other than dismissal for misconduct, having served the Company for not less than one year, you will be entitled to a further "frozen" pension at normal retirement date. This "frozen" pension will be of such an amount that, when added to the Minimum Pension, your total "frozen" pension at normal retirement date will be whatever has accrued to you under the Scheme in accordance with your total years of service with the Company and your Pensionable Salary at the time of leaving service.

---

[4] The plan did not include past service credits.

\* \* \*

17. *What happens if it is decided to alter the Scheme?*

The Company reserves the right to terminate or amend the Scheme at any time but if any termination or amendment does take place it will not adversely affect pensions then being paid, whilst members in the service of the Company would normally receive the pension accrued to them in respect of their service to the date of termination or amendment and their salary at that time in accordance with the Scheme Rules or, having left the Company's service prior to termination or amendment, their vested right to pension.

The interim deed provided that the trustees would administer the funds in accordance with the forthcoming "Definitive Trust Deeds and Rules" and, in the event any provisions thereof conflicted with the provisions in the annexed booklet, the definitive deeds and rules would prevail, except that the provisions of the definitive deeds and rules were required to be in form sufficient to satisfy the requirements for United Kingdom income tax exemption and to guarantee pension benefits equivalent to those provided for under the National Insurance Act in the event that a certificate of nonparticipating employments under that Act was obtained. The interim deed, together with the annexed booklet, unlike the definitive deed, made no provision for application of fund assets upon petitioner's cessation of business, although the interim deed specified that no alteration could be made which would result in "any payment from the Funds or either of them to the Company or any associated or subsidiary company other than a fortuitous surplus in the event of the dissolution of the Funds or either of them."

On its Federal income tax returns for fiscal 1967 and fiscal 1968, petitioner claimed pension plan contribution deductions in the amounts of $139,446.47 and $89,275, respectively, for such years. These sums represent the actual contributions petitioner made to such pension plans.[5]

The petitioner's employees' aggregate accrued benefits under the plan as described in the booklet and the present values of such benefits were (in pounds sterling):

|  | 4/30/67 | 4/30/68 |
| --- | --- | --- |
| Accrued annual benefit | £6,958.52 | £14,157.76 |
| Present value | 13,920.00 | 30,322.00 |

The dollar cost of providing these benefits was $38,976 in fiscal 1967 and $33,796 in fiscal 1968.

---

[5] Respondent does not dispute either the fact or the dollar amount of these contributions.

OPINION

## *Foreign Tax Credit*

Both parties agree that, at the time of making its fiscal 1967 tax return, petitioner properly translated its accrued foreign tax liability into dollars on the basis of the exchange rate prevailing at the close of such fiscal year for the purpose of claiming the foreign tax credit. We must decide whether the amount of such credit should be adjusted pursuant to section 905(c)[6] to reflect a different rate of exchange at the time such foreign tax liability was actually paid.

Section 905(c) provides, in part, as follows:

If accrued taxes when paid differ from the amounts claimed as credits by the taxpayer, or if any tax paid is refunded in whole or in part, the taxpayer shall notify the Secretary or his delegate, who shall redetermine the amount of the tax for the year or years affected. * * *

Petitioner argues that "accrued taxes" means taxes in terms of the foreign currency and that, since the same amount of pounds sterling was accrued and paid, no adjustment is required. In support of its position, petitioner points to the alleged silence of the Code and regulations in respect of fluctuating rates of exchange. Respondent counters with the assertion that the above-quoted section should be applied in terms of the U.S. dollar equivalent of the amount paid and that, since that amount was less than the dollar amount accrued, the foreign tax credit for the year in question should be correspondingly adjusted. We hold for the respondent.

Initially, we note that the Code encompasses a system of taxation in respect of income of United States persons and of income of non-United States persons from sources within the United States and its possessions. This system was intended to be geared to the expression of liability for the taxes imposed by the Code in terms of United States currency. See *Charles W. Puttkammer,* 66 T.C. 240 (1976). The Code itself contains at least two indications that such is the case. Secs. 6102 and 7504. Cf. sec. 6316. Indeed, petitioner does not dispute this general principle, as evidenced by the fact that it filed its returns in terms of dollars, as it was required to do. See *Frederick Vietor &*

---

[6] All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, unless otherwise stated.

*Achelis v. Salt's Textile Mfg. Co.,* 26 F.2d 249, 255 (D. Conn. 1928); O.D. 419, 2 C.B. 60 (1920).

What is more, petitioner claimed its foreign tax credit in dollars. It would thus appear that petitioner's position should be rejected, since section 905(c) speaks in terms of a determination where the taxes paid differ from *"the amounts claimed* as credits." (Emphasis added.) Additionally, it is not without significance that the section in question correlates the treatment of refunds of foreign taxes with differences between the amounts claimed and the amounts paid. It is at least doubtful that petitioner would have failed to file a claim for refund if the value of the pound sterling had appreciated or, having filed a claim, would have acceded to the respondent's failure to redetermine an overpayment. Cf. Rev. Rul. 58-237, 1958-1 C.B. 534.

Furthermore, respondent's position herein corresponds with his announced position of long standing. S.M. 4081, IV-2 C.B. 201 (1925), superseded and reaffirmed in Rev. Rul. 73-506, 1973-2 C.B. 268. Subsequent enactment of the foreign tax credit readjustment provisions (which first appeared in sections 222(b) and 238(a) of the Revenue Act of 1918)[7] can be taken as legislative concurrence in respondent's administrative interpretation and, although not determinative, as an element to be considered in determining the proper construction of the statute involved herein. See, e.g., *Helvering v. Reynolds Co.,* 306 U.S. 110 (1939).

Moreover, the decisional law—albeit sparce—supports the position urged by respondent. Thus, in *W. J. Burns,* 12 B.T.A. 1209 (1928), the issue was whether the amount of foreign taxes creditable by an accrual basis partnership should be adjusted to reflect changes made by the British taxing authorities subsequent to the end of the year. In holding that they should be so adjusted, the Board of Tax Appeals stated:

> The amounts actually paid should, therefore, be substituted for the amounts accrued. For the same reason the rate of exchange on the date of each payment should be used in computing the amount paid. [12 B.T.A. at 1226.] [8]

See *Texas Co. (Caribbean) Ltd.,* 12 T.C. 925, 928 n. 4 (1949) (dicta). See also *D. E. Brown,* 1 B.T.A. 446 (1925); *Mead Cycle*

---

[7] Sec. 131(c), I.R.C. 1939; sec. 905(c), I.R.C. 1954.

[8] The fact that the Board made specific findings of the rates of exchange in effect at the date of accrual and at the dates of payment belies petitioner's contention that the applicable exchange rate was not in issue.

*Co.,* 10 B.T.A. 887, 896-897 (1928); Owens, The Foreign Tax Credit, sec. 7/3C (1961). Ravenscroft, Taxation and Foreign Currency, sec. 14/3.2C (1973).

Finally, respondent's position coincides with the purpose of the foreign tax credit, namely, to prevent double taxation. See *American Chicle Co. v. United States,* 316 U.S. 450, 453 (1942); Owens, *supra.* Petitioner, on brief, seeks to support its position based upon an extensive analysis of the purported income tax consequences arising from the satisfaction in a later taxable year of the foreign tax obligation in foreign currency (the value of which has changed in terms of dollars) and upon whether or not the foreign profits are repatriated to the United States. In so doing, petitioner seeks to establish that the interpretation advocated by respondent violates the integrity of the accrual basis of accounting and results in inconsistent treatment of income, credits, and deductions. As intriguing as the questions alluded to in petitioner's analysis may be (see Owens, *supra,* sec. 7; Ravenscroft, *supra,* sec. 14), we find it unnecessary to engage in such an exercise. We think it sufficient, for the purposes of this case, that the credit which petitioner will obtain is precisely equal to the amount of the creditable foreign taxes in terms of dollars.[9]

For the reasons stated, we hold that the foreign tax credit available to petitioner for fiscal 1967 should be adjusted to reflect the dollar cost on the payment date of the foreign taxes that petitioner accrued on its return. That dollar cost should be determined with reference to the commercial rather than the official rate of exchange in effect on the payment date.[10] *Cinelli v. Commissioner,* 502 F.2d 695 (6th Cir. 1974), aff'g. T.C. Memo. 1973-140.

## United Kingdom Pension Arrangement

Petitioner contends that its contributions to the United Kingdom pension trust were fully deductible under section

---

[9] In reference to petitioner's contention that, in the absence of repatriation, no "gain" is realized on the decline in value of foreign currency between accrual and payment, we note that one commentator has observed that the foreign tax credit provisions were not designed either "to protect against unwise investments in foreign currency" or "to preserve the benefits of wise investments in dollars." See Owens, The Foreign Tax Credit, sec. 7/3C, p. 458 and n. 59 (1961).

[10] The petition alleges that if the payment date was found to be proper, then the official rate of exchange should be used. Petitioner, however, did not pursue this issue further either at trial or on brief.

404(a)(4) or, in the alternative, such contributions were deductible under section 404(a)(5) to the extent petitioner's employees' rights therein were nonforfeitable. Respondent would disallow petitioner any deduction in respect of such contributions.

Section 404(a)(4) permits an employer to deduct contributions to a pension trust, if such trust would qualify for exemption under section 501(a) except for the fact that it is a trust created or organized outside the United States. To qualify under section 501(a), a pension trust must meet the requirements of section 401(a) and the regulations promulgated thereunder. The key shortcoming of petitioner's trust during fiscal 1967 and fiscal 1968 is contained in the provision of the interim deed which specifies that, in the event of a conflict between the terms contained in the descriptive booklet annexed to the interim deed and the terms contained in the forthcoming definitive deeds and rules, the latter would prevail. That being the case, there was such uncertainty of pension terms prior to the execution of the definitive deeds and rules as to preclude qualification under section 401(a) which requires a "definite written program" for the payment of "definitely determinable benefits." Secs. 1.401-1(a)(2) and 1.401-1(b)(1)(i), Income Tax Regs.

Moreover, we note that section 1.401-4(c), Income Tax Regs., requires certain express restrictions on benefit payments to prevent discrimination in the application of trust contributions in favor of petitioner's 25 highest paid employees in the event the plan would be terminated within the first 10 years of its existence or in the event it would be terminated after 10 years, but before the current cost for the first 10 years is fully funded. The absence of these express restrictions will not affect plan qualification only if—

(i) it is reasonably certain at the inception of the plan that such restrictions would not affect the amount of contributions which may be used for the benefit of any employee, or (ii) the Commissioner determines that such provisions are not necessary to prevent the prohibited discrimination that may occur in the event of any early termination of the plan. * * *

Neither the interim deed nor the attached booklet contained such restrictions. We, therefore, think the "reasonable certainty" exception cannot be successfully invoked where, at the inception of the plan involved herein, benefits were not determinable owing to the employer's right to alter the same via the definitive deeds

and rules. In this context, petitioner's argument that, as a practical matter, the plan complied with such restrictions totally misses the mark.

We are also constrained to add that the interim deed failed to meet at least one other section 401(a) requirement. Neither the interim deed nor the annexed booklet provided that forfeitures must not be applied to increase the benefits any employee would otherwise receive under the plan. The express inclusion of such a provision is required by section 401(a)(8). See secs. 1.401-1(b)(1)(i) and 1.401-7, Income Tax Regs; S. Rept. No. 992, 87th Cong., 1st Sess. 28 (1961), 1962-3 C.B. 303, 330. The provision in the interim deed that the definitive deeds and rules could not permit the reversion of any trust funds to petitioner "other than a fortuitous surplus in the event of the dissolution of the Funds" does not satisfy this statutory requirement. If it did, the enactment of section 401(a)(8) in 1962 (Pub. L. 87-792, 76 Stat. 809) would have been unnecessary in light of the then-existing provisions of section 401(a)(2), and section 1.401-2(b), Income Tax Regs.

In view of the foregoing, we hold that petitioner's contributions to the pension plan in fiscal 1967 and fiscal 1968 were not deductible under section 404(a)(4).

In so holding, we have given consideration to petitioner's reliance on *Aero Rental,* 64 T.C. 331 (1975), in asserting that we should give the Definitive Trust Deed and Rules retroactive effect. Aside from the fact that the opinion therein is based upon the particular facts and circumstances of that case, we note that there is one overriding distinction. In *Aero Rental,* a detailed plan was submitted to respondent for approval. In the instant case, not only is there no evidence that any such submission was made, but, for aught that appears in the record herein, only the interim deed with annexed booklet had been submitted to Inland Revenue during the years in issue, although petitioner's expert witness testified that the normal procedure was to submit a definitive trust deed (presumably in proposed form) to that office for review and possible discussion at about the time the interim trust deed was signed. In this connection, we offer no intimation as to whether the definitive deed and rules constituted a qualified plan within the meaning of section 401(a) in later years.

We now must consider whether any portion of petitioner's contributions was deductible under section 404(a)(5). That section,

as it existed during the taxable years in question, provided for a deduction of contributions to nonqualified plans "if the employees' rights to or derived from such employer's contribution or such compensation are nonforfeitable at the time the contribution * * * is paid." Nonforfeitability means that at the time of such contribution there is *no contingency* under the plan that may cause the employee to lose his rights therein. Sec. 1.402(b)-1, Income Tax Regs.

The interim deed required the definitive deeds and rules to provide benefits at least equivalent to those that the employees would have received under the National Insurance Act and the booklet elaborated on this provision by specifying the "minimum pension" as a pension at least as large as could have been earned in the highest grade of the State graduated scheme in respect of (A) contributions. See p. 352 *supra.* Thus, although the definitive deeds and rules could materially alter the benefits described in the interim deed and booklet, plan benefits could not be reduced below this amount.

Paragraph 14 of the descriptive booklet describes the nonforfeitable benefits to which petitioner's employees were entitled. See p. 352 *supra.* All employee-members were entitled to the "minimum pension" if they left the company at any time for any reason. An employee who left after 1 year of service would be entitled to greater benefits based upon a "percentage of annual earnings multiplied by length of service" formula *only if* the reason for his leaving was other than "dismissal for misconduct." Thus, any benefits above the "minimum pension" were subject to a contingency, i.e., misconduct; as a consequence, they were not nonforfeitable within the meaning of section 404(a)(5) and section 1.402(b)-1(a)(2), Income Tax Regs. See *Liberty Machine Works, Inc.,* 62 T.C. 621, 635 (1974), affd. 518 F.2d 554 (8th Cir. 1975).

We hold that each of petitioner's employees had a nonforfeitable right to the "minimum pension" and that to the extent that petitioner's contributions reflected the cost of providing benefits equivalent to the "minimum pension" for each

employee, petitioner is entitled to a deduction under section 404(a)(5) for fiscal 1967 and fiscal 1968.

*Decision will be entered under Rule 155.*

[2] Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the years involved herein.