WILLIAM E. RILEY AND JUNE RILEY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Riley v. Commissioner
Docket No. 3152-77.
United States Tax Court
T.C. Memo 1981-705; 1981 Tax Ct. Memo LEXIS 38; 43 T.C.M. (CCH) 80; T.C.M. (RIA) 81705; December 14, 1981. Joe K. Gordon, for the petitioners. Norman A. Lofgren, for the respondent. EKMAN
MEMORANDUM FINDINGS OF FACT AND OPINION EKMAN, Judge: Respondent determined deficiencies in petitioners' Federal income tax for the taxable years 1969 to 1972 and additions to tax pursuant to section 6653(b), I.R.C. 1954, in the following amounts: Petitioner
Year
Deficiency
Sec. 6653(b)
William E. Riley
1969
$ 26,671.89
$ 13,335.95
June Riley
1969
26,590.40
William E. &
June Riley
1970
26,585.27
13,292.63
1971
5,202.88
2,601.44
1972
3,629.97
1,814.99
Due to concessions by the parties, the issues remaining for decision are whether: (1) amounts distributed in 1969 and 1970 by T.B.S., Inc., a Subchapter S corporation, to and on behalf of petitioner William Riley were loans, (2) Nor-Tex X-Ray, Inc. made pro rate contributions to the capital of T.B.S., Inc. in 1969 to 1971 on behalf of petitioner William *40 Riley, (3) Nor-Tex X-Ray, Inc. rented certain warehouse space between 1969 and 1971, (4) petitioners received income in 1972 from the cancellation by Nor-Tex X-Ray, Inc. of a $ 10,000 debt, (5) petitioners suffered business bad debts in 1969 through 1972, and (6) any part of the underpayments of tax of petitioner William Riley was due to fraud. Respondent has conceded, however, that no part of the underpayments was due to fraud on the part of June Riley. FINDINGS OF FACT Some of the facts have been stipulated by the parties and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Petitioners William E. Riley (Riley) and June Riley, husband and wife, were residents of Fort Worth, Texas at the time the petition herein was filed. For the taxable year 1969, William Riley timely filed Form 1040 as a married person filing separately. [1] For the taxable years 1970 to 1972, petitioners timely filed joint Forms 1040. They are cash basis taxpayers. *41 Riley became acquainted with Doris Evans (Evans) in the early 1950s while both were working at Alloy Heat Treating and Testing (Alloy). Alloy was a profitable corporation which provided x-ray heat treating and chemical analysis for the aircraft industry. Evans purchased Alloy in 1955 and 1956, and subsequently gave Riley a portion of the Alloy stock, which eventually amounted to 48 percent, for his work in the company and because she felt that he was a "deserving person." In 1957, she also acquired a company called Texas Bronze, which made aluminum/magnesium castings for the aircraft industry, and in 1958 or 1959 gave to Riley a stock interest in Texas Bronze. Riley became president of Alloy and Texas Bronze and his duties included running the plants, handling production schedules, and overseeing quality control and purchases. In 1967, Anadite Corporation (Anadite) acquired all the stock of Alloy and Texas Bronze fro Evans and Riley in exchange for Anadite stock. To effectuate this acquisition, Evans and Riley were required to contribute to the capital of Alloy an unspecified amount of money which they had previously withdrawn from Alloy. Evans borrowed $ 200,000 from the *42 State Bank of East Fort Worth (State Bank) to contribute to Alloy and Riley was also forced to borrow some money. They collateralized those loans with a pledge of the Anadite stock they expected to receive. The Anadite stock was "letter stock" which, under Securities and Exchange Commission rules, could not be sold immediately. Riley was made a director of Anadite, and he was subject to further securities law limitations as to the amounts of stock he could sell while he remained a director. Riley later became president of Anadite in 1970, but was removed in December 1971 by the "power play" of another director. At the time Riley and Evans received the Anadite Stock, it was publicly traded at $ 35 or $ 36 per share. Shortly thereafter, it increased in value to around $ 63 per share, and then began a rapid decline, falling in value to around $ 3 per share. This decline made the Anadite stock inadequate as collateral to help Riley finance other investments. During the taxable years is issue, Riley and Evans also owned all the stock of two Subchapter S corporations, Nor-Tex X-Ray, Inc. (Nor-Tex) and T.B.S., Inc. (TBS). Nor-Tex was a profitable corporation in the business *43 of building and selling x-ray film and equipment, while TBS was formed to buy and sell real estate and to operate a potential Kodak franchise. Riley was president of Nor-Tex until July 27, 1972. At all times material hereto, he was president of TBS, and Evans was secretary/treasurer of both Nor-Tex and TBS. On January 30, 1969, Riley and Evans signed a 6-month non-recourse promissory note with State Bank on behalf of TBS in the face amount of $ 150,000, and they signed renewals of the note on July 30, 1969 and January 30, 1970. Evans paid the note in full on April 7, 1970 by issuing a personal check, and the TBS ledger indicates that on that date TBS became indebted to her in the amount of $ 150,000. The ledger further shows that, in October 1970, the corporate debt to Evans was "transfered [sic]" to Riley. On July 15, 1970, William and July Riley became indebted to State Bank in the principal amount of $ 200,000, and were required to make semi-annual payments on the loan totalling $ 14,718.00, of which $ 8,540.23 was allocable to principal and $ 6,177.77 to interest. On November 30, 1970, the TBS ledger and journal show that TBS made a $ 14,718.00 "Note Payment" to Riley, *44 which was allocated to principal and interest in the same amounts as were due on petitioners' State Bank note. The next day, petitioners made a semi-annual payment to State Bank on the $ 200,000 loan. Riley was involved in at least four businesses in addition to the above-mentioned corporations. He invested in Rey-Tex Petroleum and guaranteed its promoter's personal notes. He invested heavily in Porta-Ad, Inc. and guaranteed noted for its president; the company was adjudicated bankrupt in 1970. He owned 90 percent of Ryco Enterprises, Inc. stock; that company was dissolved in 1970. He owned 100 percent of Beach Industrial Corporation stock, guaranteed some of the company notes, then was required to honor those guarantees; the company was sold at a loss in 1971. On June 1, 1968, Riley purchased a one-third interest in a tract of land located outside of San Antonio (Bexar County property) from Richard M. Jones and Charles Owen. The stated purchase price was $ 100,000, of which $ 56,222.22 was paid in cash, and the balance with a promissory note. On August 12, 1969, Jones sold to Riley and to Riley's brother-in-law, Richard Bloomfield, a two-thirds interest in another tract *45 of land (South Freeway property), subject to a $ 140,000 note. Although TBS never had record title to these properties, entries in its ledger and journal for 1969 show that it issued checks totalling $ 170,044.77 to Riley, Jones and the Continental National Bank[2] for payments on the Bexar County[3] and the South Freeway properties. [4] Riley eventually sold these properties in his personal capacity. During 1969 and 1972, Evans, as secretary/treasurer of Nor-Tex and TBS, prepared fraudulent invoices for merchandise, thus overstating those companies' costs of goods sold. The invoices were created each time note payments came due on obligations of Nor-Tex and TBS which *46 related to an oil deal Riley had entered with one John Reynolds. [5] Riley would present a payment notice to Evans, she would create an invoice to cover it, and he would sign or initial the invoice when she presented it to him. The invoices reflected the purchase of goods by TBS from vendors who were non-existent, sales of the fictitious goods by TBS to Nor-Tex, and sales by Nor-Tex to Alloy of those same fictitious goods. In this manner, TBS and Nor-Tex extracted sufficient cash from Alloy to pay off the notes as they came due. In addition, Nor-Tex of TBS would sometimes issue a check to one of the non-existent vendors, which Evans and Riley together would take to bank, cash, and divide the proceeds. Riley and Evans were indicted in April 1976 for tax fraud under 26 U.S.C. section 7206. Evans entered a plea of guilty and was convicted. In July, Riley entered a plea of guilty to one of eight counts, but in October made a motion to withdraw the plea on grounds of his mental condition. This indictment was dismissed in *47 1979 on grounds that he was "presently mentally incompetent to stand trial," and was unlikely to become competent to stand trial in the foreseeable future. Less than 2 months after Riley entered his guilty plea, he underwent surgery to remove a type of benign brain tumor, known as an acoustic neuroma, from behind his ear. He had had surgery in 1958 to remove an earlier tumor; however, the surgeon was unable to excise the tumor entirely, and it slowly regrew. When it was removed in 1976, the regrowth had reached a diameter of 1.5 centimeters. Acoustic neuromas typically do not impair intellectual function and judgment because of their location. They can cause such impairment only if they prevent drainage from another part of the brain. More precisely, they may occlude the fourth ventricle, causing swelling and pressure on the cerebral hemisphere where intellectual function and judgment are generated. In a preoperative brain scan performed in 1976, Riley showed no signs of such fourth ventricle occlusion, nor dilation of the lateral and third ventricles which would have resulted from such occlusion. Furthermore, records maintained by Riley's physicians from 1958 to 1976 *48 failed to document any significant changes in his mental status or to suggest that his judgment and intellect were impaired, and none of the records finds clinical evidence of tumor regrowth before 1976. However, during the same period each of Riley's doctors noted that he was under stress as a very active businessman. In 1969 to 1972, when the fraudulent income scheme at TBS and Nor-Tex was carried out, Riley was either president or chief operating officer of five corporations. He was also a member of the board of directors of Anadite, and of State Bank, where he served capably on the loan and discount committee. None of Riley's colleagues noted any impairment in his business judgment of intellect during the years in issue. They noted that he kept himself informed about the daily operations of the corporations, and that he been operated. However, June Riley observed that when Riley became president of Anadite he became nervous, irritable, demanding, and he suffered from pain. OPINION Characterization of TBS Payments
In 1969 and 1970, TBS paid amounts totaling $ 170,044.77 and $ 29,708.83 respectively to Riley and various other persons. Respondent determined that *49 these distributions were payments connected with Riley's ownership of properties in Bexar County and on the South Freeway. As TBS had no current or accumulated earnings and profits, he treated the distributions as capital gain to the extent that they exceeded Riley's basis in his TBS stock. Section 301(c)(3), I.R.C. 1954. Petitioners deny that the amounts TBS paid in 1969 and 1970 to Riley and others were distributions. Instead, they characterized the monies received as loans from State Bank to Riley through the medium of TBS.
Whether a distribution is a loan depends upon all the facts and circumstances surrounding the transaction. Roschuni v. Commissioner, 29 T.C. 1193, 1202 (1958), aff'd. 271 F.2d 267 (5th Cir. 1959), cert. denied 362 U.S. 988 (1960). A necessary element of a loan is that the shareholder intend to repay the loan at the time a withdrawal is made, and that the corporation intent to enforce the obligation. Haber v. Commissioner, 52 T.C. 255, 266 (1969). Other relevant facts are whether *50 the withdrawals are carried on the corporate records as accounts receivable, whether the withdrawals are secured by the shareholder's interest bearing notes, and whether interest is paid by the stockholder or charged by the corporation. Adams v. Glenn, an unreported case ( W.D. Ky. 1950, 42 AFTR 1356, 50-2 USTC par. 9447). Riley's intent at the time the monies were paid to him is a matter of conjecture. Riley neither testified nor did he submit any other evidence as to his intent. Evans, a 50 percent shareholder and secretary/treasurer of TBS, thought that the distributions were consideration paid by TBS for the Bexar County and South Freeway properties, and petitioners so characterized the distributions in their reply to respondent's answer. However, they recharacterized the monies as loans in their trial memorandum. Because evidence bearing on Riley's intent is conflicting, we must look to other facts and circumstances to determine whether the monies were received by Riley as a loan. Petitioners first contend that the 1969 and 1970 withdrawals were carried on TBS's books as accounts receivable. The Supreme Court has stated "* * * book-keeping entries, *51 though in some circumstances of evidential value, are not determinative of tax liability." Helvering v. Midland Mutual Life Insurance Co., 300 U.S. 216, 223 (1937). In this case, we can attribute minimal evidential value to the bookkeeping entries in TBS's journal and ledger because the entries are ambiguous and incomplete. The record of the $ 150,000 loan from State Bank to TBS indicates that Evans repaid the loan on behalf of TBS so that TBS became indebted to her, and somehow the resulting indebtedness to her was transferred to Riley and carried on the books as a payable to Riley. Such entries are hardly sufficient to prove an indebtedness of Riley to TBS. Still other journal entries show that Riley received a $ 117,000 payment from TBS on the Bexar County and South Freeway properties, yet an entry on the same journal line shows a TBS payable of $ 150,000 to him. The ledger account of these latter journal entries supports Evans's contention that the payments were made on the Bexar County and South Freeway properties. It shows that debt owed on the properties by TBS was paid down in the amount of $ 117,000 on the same date that Riley received $ 117,000 from *52 TBS. In sum, no ledger or journal entry corresponding to the distributions at issue shows a TBS receivable due from Riley. Petitioners allege next that Riley's withdrawals were secured by an interest bearing obligation. Although petitioners' brief admits "[t]here was no note from Riley to [TBS]," they stress that Riley's signature was on the note to State Bank, and that the president of State Bank was looking to Riley to "make to loans good." However, the note was an obligation of TBS to State Bank, and by its terms was not a personal obligation of Riley. It was in the name of TBS and was signed both by Riley and Evans as corporate officers. Reliance by the president on Riley's ability to "make the loans good" shows no more than that the president believed that under Riley's guidance the company would be successful enough to repay the loan, not that Riley was personally liable or was a guarantor of TBS's obligation. Finally, petitioners contend that Riley's obligation to TBS bore interest and that he paid interest. However, we have examined the TBS ledger and journal. These books do not show that Riley paid interest to TBS. They show that TBS paid Riley. Faced with *53 the foregoing accumulation of facts and circumstances, we must conclude that the distributions made by TBS to or on behalf of Riley were not loans. As the parties agree that TBS had no accumulated earnings and profits, we hold that the distributions were capital gain to petitioners to the extent that the distributions exceeded petitioners' basis in their TBS stock. Nor-Tex Payments to TBS
Respondent contends that since TBS sold no goods to Nor-Tex in 1969 to 1971, the monies which TBS received from Nor-Tex as payment for goods received were, in substance, pro rata contributions by Nor-Tex to the capital of TBS. Characterizing these payments as capital contributions, rather than as income, increases Riley's basis in his TBS shares, [6] and decreases TBS's undistributed taxable income, and Riley's portion thereof, in 1970 and 1971. Petitioners object to respondent's attempt to increase Riley's TBS basis, [7] and to decrease his portion of TBS undistributed taxable income, observing that the issue of capital contributions was raised for the first time on brief. [8] Because respondent did not raise the issue of recharacterization of the payments from Nor-Tex to TBS in the notices *54 of deficiency or in the pleadings, and as petitioners had no other notice that respondent would characterize the sales between TBS and Nor-Tex as capital contributions, the issue of recharacterization is not properly before us. Aero Rental v. Commissioner, 64 T.C. 331, 338 (1975); Rubin v. Commissioner, 56 T.C. 1155, 1163 (1971). Section 165 and 166
In 1969 through 1972 petitioners suffered losses in various business ventures which they reported as section 165 short-term capital losses and as section 166 nonbusiness bad debts. They now *55 contend that these losses should be treated as ordinary business losses and business bad debts, respectively. The losses were incurred through Riley's involvement in Rey-Tex Petroleum, Porta-Ad, Beach Industrial Corporation, and Ryco, four businesses which "folded" in or about 1970, and to which Riley had lent money, contributed capital, and guaranteed loans (on which he was forced to make good in some cases). Under sections 165 and 166, Riley's losses may be characterized as ordinary losses or as business bad debts only if they were incurred in a trade or business. A trade or business is an occupation to which a taxpayer contributes a major or substantial part of his time for purposes of livelihood or profit. Snyder v. Commissioner, 295 U.S. 134 (1935). If Riley was in the trade or business of promoting, financing, or managing business ventures, of lending money to ventures and individuals, or if he made loans to protect his salary and his job, then petitioners are entitled to business deductions relating to Riley's business ventures which failed. O'Neill v. Commissioner, 271 F.2d 44 (9th Cir. 1959), *56 affg. a Memorandum Opinion of this Court. Cf. Holtz v. Commissioner, 256 F.2d 865, 870 (9th Cir. 1958). However, petitioners have not shown that Riley satisfied the trade or business requirements.
To be in the business of promoting enterprises, a taxpayer must demonstrate that he has regularly promoted businesses for a fee or commission which is separate from his director's salalry or investor's return, or for a profit on the sale of those businesses. See Whipple v. Commissioner, 373 U.S. 193, 202-203 (1963). Also O'Neill v. Commissioner, supra.In Whipple, the taxpayer formed several partnerships, incorporated 15 businesses and sold 12, acquired and disposed of a restaurant, and participated in several oil ventures, all over the course of a few years, yet he was held not to be in the trade or business of organizing or promoting corporations for a profit. [9] Riley was similarly involved in a number of businesses. However, the record does not demonstrate that he organized any of them or, if he organized any, that he received *57 a fee or commission for doing so. The evidence does indicate that he did not organize Anadite, Texas Bronze, or Alloy. Moreover, there is no showing that Riley intended to sell for a profit any of the corporations which he may have organized, or that any such sales occurred. In light of Whipple, and in the absence of evidence as to Riley's promotional activities, we conclude that petitioner Riley was not in the trade or business of promoting corporations. *58 Petitioners have also failed to prove that Riley's dominant motive for lending was to protect his salaried status as an employee. Riley made loans to businesses in which he was both an investor and an employee. The Supreme Court has held that an investor/employee who makes loans to his businesses may deduct losses resulting from those loans as business bad debts only if the taxpayer's dominant motivation for making the loans was to preserve his salary, not his investment. United States v. Generes, 405 U.S. 93, 96 (1972). Petitioners introduced no evidence as to Riley's motivation for making the loans. We observe, however, that Riley's investment in the businesses to which he made loans was much greater than his salary. Further, petitioners originally treated the losses as nonbusiness bad debts on their income tax returns. Because petitioners have failed to come forward with evidence to show Riley's dominant motivation for making the loans related to his salalry or job, they have failed to sustain their burden of proof. Rule 142(a), Tax Court Rules of Practice and Procedure.
*59 Finally, petitioners have not shown that Riley was in the trade or business of lending money to ventures and individuals. While they contend that Riley made numerous loans to friends, employees, business associates, and business ventures, they have failed to substantiate those loans with figures, documents, records of interest income received or payments made, or with any other evidence. In the absence of evidence, we are unable to conclude that Riley was in the business of making loans. See Rule 142(a), Tax Court Rules of Practice and Procedure.
Because we have found that Riley was not in the trade or business of promoting business ventures, or of lending money, and because the loans he made to businesses were not made to protect his salary or his job, petitioners are not entitled to deduct the losses from Rey-Tex, Porta-Ad, Ryco, and Beach Industrial as ordinary losses or business bad debts. Sections 165 and 166. 1970 Interest and Legal Expenses of TBS
In the statutory notice of deficiency, respondent disallowed deductions to TBS of $ 9,217.77 in interest expenses and $ 617.50 of legal expenses, and treated those payments as distributions to petitioners. However, *60 he then allowed petitioners to deduct $ 9,217.77 on their joint return as an interest expense. On brief, respondent also seeks to disallow a $ 6,066.66 interest payment made by TBS to State Bank, asserting that TBS had no outstanding corporate loans with State Bank when the payment was made. Since the $ 6,066.66 interest expense was not challenged at trial or in the pleadings, and was first raised on brief, we will not consider respondent's argument. Aero Rental v. Commissioner, supra.
Petitioners present conflicting objections to respondent's $ 9,217.77 interest expense adjustment. Initially, they claim that the interest expense was first disallowed to TBS on brief. However, they accept respondent's correlative adjustment to their personal income tax liability which attributes to them the interest expense disallowed to TBS. Both the legal and interest expense deductions were disallowed to TBS and treated as distributions to petitioners in respondent's notice of deficiency. Aero Rental does not apply. Petitioners bear the burden of proving that respondent's *61 determinations are incorrect. Rule 142(a), Tax Court Rules of Practice and Procedure. Since they have not come forth with any evidence to show that the claimed adjustments should not be made, we sustain respondent's disallowance to TBS of the claimed interest expenses and legal expense and treatment of them as distributions to petitioners. See Welch v. Helvering, 290 U.S. 111 (1933). Rental Expenses of Nor-Tex
In 1969 to 1971, Nor-Tex claimed deductions for the rental of warehouse space. Respondent disallowed these deductions in his notice of deficiency because No-Tex had failed to establish that the amounts were actually expended, or that they were ordinary and necessary business expenses within the meaning of section 162. It is not clear whether petitioners have conceded this issue. However, they disclaim any knowledge regarding the deductions. Deductions are a matter of legislative grace, and petitioners must come forth with evidence to show that they are entitled to them. New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934). Furthermore, *62 respondent's determinations are presumptively correct and will be sustained if petitioners do not meet their burden of proof. Welch v. Helvering, supra.Because petitioners have submitted no evidence concerning this issue, respondent's determination is sustained. Rule 142(a), Tax Court Rules of Practice and Procedure.
1972 Cancellation of Indebtedness Income from Nor-Tex
Respondent determined that petitioners realized $ 10,000 of ordinary income in 1972 because Nor-Tex cancelled that amount of indebtedness owed to it by petitioners. Petitioners assert that this determination is not sustained by the journal and ledger entries which are relied on by respondent as showing the supposed cancellation. We have examined those records, and we are unable to conclude that they show that Nor-Tex cancelled a $ 10,000 debt owed by petitioners. We find that petitioners have shown that respondent's determination was without support in the record and have sustained their burden of proof. Rule 142(a), Tax Court Rules of Practice and Procedure. Accordingly, we find for petitioners on this issue. Special Evidentiary Question
During the trial of this case, *63 John Hughes, formerly an attorney for Evans, testified that Evans had told him that Riley did not participate in the fraudulent invoice scheme. When Hughes testified, Evans was excluded from the court-room; however, both before and after he testified, and after being alerted to her rights under the attorney-client privilege, Evans testified that she had no recollection of making such a statement to Hughes and, if she had done so, it was not the truth. Both parties extensively briefed the issue of whether any attorney-client relationship existed between Hughes and Evans at the time the alleged statement was made, and thus whether the communication was privileged. Because we find that Evans implicitly waived any privilege that may have existed by her voluntary testimony denying the existence of the statement she allegedly made to Hughes, we need not reach the issue of whether the alleged communication was privileged. See Stickney v. Stickney, 131 U.S. 227 (1889); Hunt v. Blackburn, 128 U.S. 464 (1888). Hughes's testimony on the purported statement is accordingly admissible, and we have considered it, together with Evans's testimony, in reaching *64 our findings herein. However, as we point out below, respondent has submitted sufficient evidence of William Riley's fraudulent intent to discharge his burden of proof, despite the admission of Hughes's testimony. Intent to Defraud
The parties agree that the cost of goods sold by TBS and Nor-Tex was fraudulently overstated for the taxable years in issue. Petitioners contend that the fraud was entirely perpetrated by Doris Evans without William Riley's knowledge, participation, or acquiescence; and that, whether or not Riley knew of the scheme, his mental condition at the time the invoices were created was such that he could not have had the requisite fraudulent intent. Respondent disagrees, and asserts that Riley is liable under section 6653(b) for an addition to tax due to fraud. However, he concedes that no part of the underpayments is due to fraud on the part of petitioner June Riley. Fraud cannot be lightly inferred; respondent must affirmatively establish by clear and convincing evidence that it existed. Beaver v. Commissioner, 55 T.C. 85 (1970); Rule 142(b), *65 Tax Court Rules of Practice and Procedure.
For section 6653(b) to apply there must be (1) an underpayment of tax, (2) some part of which is due to fraud. We have found that petitioners received, but did not report, corporate distributions in excess of their stock basis, and therefore that there was an underpayment for the years in issue, and petitioners apparently concede the existence of an underpayment. Whether fraud existed is a question of fact that must be determined from the entire record. See, e.g., Stratton v. Commissioner, 54 T.C. 255 (1970). Fraud is intentional wrongdoing, and the intent required is evasion of taxes believed to be owing. Mitchell v. Commissioner, 118 F.2d 308 (5th Cir. 1941). Petitioners argue that the recurrence and effects of a brain tumor precluded Riley from forming the requisite fraudulent intent. Riley had fragments of a slow growing tumor in his brain when the fraudulent invoice scheme was carried out. However, testimony both from medical witnesses and business colleagues indicates that although Riley was under *66 stress as president or chief managing officer of five corporations, as an investor in four failing ventures, and as a member of the Board of Directors of a bank, he was not unable to reason or to make business judgments. Riley's neurologist found no clinical evidence of recurrence of the tumor as late as July 1976. Riley's personal physician, consulted first in 1971, did not until 1976 note any evidence of medical problems from the prior brain tumor. Respondent's expert, a neurologist and associate professor of neurology, testified that an acoustic neuroma would not affect judgment and intellect unless it occluded fluid drainage from the cerebral cortex. [10] He also stated that Riley's medical records neither showed that such fluid drainage was hindered, even at the time the regrowth was removed, nor suggested that Riley's cerebral cortex had been affected in any other way. Testimony by business colleagues indicated that they did not note any changes in Riley's behavior or reasoning capacity, and that they believed he was able to make competent financial decisions. However, petitioner June Riley stated that when Riley was president of Anadite he was "spreading himself too thin", *67 was having "severe pains", and was very nervous and irritable. While we believe that petitioner June Riley's testimony was sincere, nervousness and irritability are at least as frequently symptoms of stress, suffered by an overworked businessman, as they are symptoms of impaired mental capacity. The evidence shows not only that Riley was capable of making informed business judgments at the time the fraudulent invoice scheme occurred, but that he did make such decisions. On the record before us, we find that Riley was capable of forming the intent to commit fraud during the taxable years in issue. Therefore we must consider whether he had the requisite intent.
The consistent understatement *68 of substantial amounts of income is persuasive evidence of fraud. United States v. Calderon, 348 U.S. 160 (1954); Rogers v. Commissioner, 111 F.2d 987 (6th Cir. 1940), affg. 38 B.T.A. 16 (1938). However, it can happen that business associates who keep the corporation's books or prepare its tax returns may defraud their colleagues as well as the tax collector. Thus, the law provides that a shareholder in a Subchapter S corporation, like a partner in a partnership, is not automatically guilty of fraud by reporting his share of fraudulently understated taxable income. Estate of Roe v. Commissioner, 36 T.C. 939 (1961). Petitioners concede that Nor-Tex and TBS consistently underreported substantial amounts of income, but contend that Riley was merely an innocent share-holder defrauded by a corporate bookkeeper. They would have us contrast Riley with Evans, who prepared the fraudulent invoices, who pleaded guilty to criminal tax evasion, and who kept the books of the corporations which served as the vehicles for the fraudulent invoice scheme. They argue that he was innocently and unwittingly implicated in the scheme *69 because he relied too heavily on the advice of those he trusted. Respondent has convinced us otherwise. William Riley was a very busy man. However, none of the persons who testified and with whom he had business dealings suggested that he did not keep close watch on his business ventures. As president of TBS and Nor-Tex he worked and conferred with Evans daily, except for the year he was president of Anadite, when he saw her several times each week. As head of Texas Bronze, one of the corporations acquired by Anadite, he worked on a day-to-day basis in the offices where purchasing, and accounts receivable and payable were handled, and had daily contact with, or reports from, the production department. As head of Alloy, he was kept informed of production schedules, shipments, and problems by its manager. As president of Beach Industrial, one of the companies that went under, he would visit its offices weekly and would meet every evening with its secretary who would bring him up to date on the events of the day. Riley was, by all accounts, a conscientious businessman. However, petitioners would have us believe that Riley, who admittedly signed the fictitious invoices, was wont *70 to sign business papers put before him without reading or even skimming them. Respondent argues that Riley's signatures on the invoices are clear indication of his fraud. We agree with respondent. The invoices were for x-ray film, and Riley had been intimately familiar with the x-ray business even before he met Evans, when he worked as an x-ray technican and plant manager of Alloy; this involvement and familiarity with x-ray film purchasing had increased rather than diminished over the years. The parties agree that TBS, in at least one of the years the scheme was conducted, made no actual purchases or sales. During that time, Riley was president of TBS and signed invoices for it. Assuming arguendo that he did not know of the scheme, he would have been alerted to it in 1969 when he was asked to sign TBS invoices. We can believe, as petitioners suggest, that Riley did not read every word of each document placed before him for signing; however, it strains our credulity to think that Riley did not notice he was signing documents of sale for a company which was making no sales or purchases during an entire year in which he signed the invoices. Petitioners argue that Evans *71 was the sole perpetrator of the fraud and that Riley was unaware of the invoice scheme. They urge that she, of her own volition and without Riley's encouragement or knowledge, concocted the plan. This theory completely contradicts Evans's testimony that she and Riley had devised the scheme, even going to the bank together to cash checks which had been issued by TBS in the names of the fictitious vendors and splitting the cash between them. It is supported only by attorney Hughes's testimony as to a statement Evans purportedly made exonerating Riley; however, Evans did not recollect making such a statement and testified that, if made, the statement would have been untrue. On the present record, we are of the belief that Evans' testimony before us is credible. She had pleaded guilty to a criminal indictment on the scheme and had been sentenced, and thus could not exonerate herself by blaming Riley. At trial, she did not accuse Riley, but spoke highly of his business abilities and affability, and described the scheme as a plan she and Riley had created together, after mutual discussion, for raising cash. Petitioners suggest that Evans was hostile to Riley, and wanted to "bring *72 him down" because he had "beat the rap" while she did not. We observed Evans's demeanor at trial and saw no evidence of such malice in her testimony. She even helped Riley financially after her conviction, furnishing his laboratory with needed film. Nor, as petitioners imply, was Riley acquitted on his indictment for criminal fraud while Evans was found guilty. Instead, the charges against him were dismissed in 1979 because he was, at that time, mentally incompetent to stand trial, and his condition was not expected to improve in the foreseeable future. However, the dismissal of the charges against him was in no way based upon any findings as to his mental condition during 1969 to 1972. Petitioners' version of the evidence, which attributes to Evans complete culpability, does not explain why Evans was motivated to adopt a scheme which redounded more to Riley's benefit than her own, but which exposed only her to civil and criminal liability. A more reasonable look at the evidence shows that Riley, not Evans, had strong reasons to adopt the plan. At the time the scheme began Riley, not Evans, was in rapidly declining financial circumstances. The notes paid off by the invoice *73 scheme were obligations of Nor-Tex and TBS on an oil deal which was a personal venture of Riley's, not of Evans's. The corporate signatory on the notes in all cases but one was Riley, not Evans. [11] Despite the decline in value of the Anadite stock, Evans was able to make ends meet on her own and had no personal obligations outstanding. The evidence clearly shows that Riley needed cash badly and was an integral part, if not the originator, of the invoice scheme. Petitioners' explanation of the understatements of income is unsupported by the evidence. It assumes that Riley was a careless businessman, and that Evans voluntarily exposed herself to prosecution to aid Riley on his personal oil deal without his encouragement, knowledge or participation. Petitioners' arguments do not impress us. We find respondent has sustained his burden of proof by showing clearly and convincingly that Riley signed the invoices knowing that they were from fictitious vendors, and with the intent fraudulently to evade taxes. Accordingly, we hold that petitioner *74 William Riley is liable for the addition to tax under section 6653(b). Decision will be entered under Rule 155. Footnotes
1. The statute of limitations bars assessment and collection of June Riley's separate deficiency for the taxable year 1969 since respondent concedes that she is not liable for the fraud penalty under sec. 6653(b)↩.
2. The role of Continental National Bank is unclear. It appears from bookkeeping entries that TBS borrowed $ 100,000 from Continental to purchase the Bexar County land. ↩
3. On January 30, TBS paid Riley $ 57,000 on this land, and on June 12 it paid Continental National Bank $ 12,440.33, of which $ 9,333.33 was allocated to principal. ↩
4. On January 30, TBS paid Riley $ 60,000, on March 10, it paid Jones $ 25,000, and on August 12, it paid Jones $ 15,551.94 of which $ 11,333.33 was allocated to principal.↩
5. Evans and Riley signed together as officers of the corporations on only one of the notes; Riley was sole signatory on all others.↩
6. Petitioners' basis in their TBS shares affects the amount of gain and loss they must recognize as a result of distributions and loss flow-through from TBS, a Subchapter S corporation. Secs. 1374 and 1376. ↩
7. June Riley's 1969 return is not before us due to concessions by respondent. ↩
8. Petitioners' position in this regard is unexplained. Their rejection of respondent's capital contribution theory would be understandable if respondent were seeking to tax their capital contribution to TBS as a constructive dividend from Nor-Tex. However, it appears that respondent makes no such assertion.↩
9. We found that the taxpayer's purpose if forming and selling the businesses was to facilitate his construction or real estate business. Whipple v. Commissioner, T.C. Memo. 1960-36. The Supreme Court agreed with this conclusion noting that the taxpayer had rested his claim for ordinary deductions upon the theory that his active service in his own corporations, for the purpose of creating future income, was a trade or business. Whipple v. Commissioner, 373 U.S. 193, 203 (1963). In the absence of an intention to develop and sell the corporations as going businesses for sale to customers in the ordinary course of business, taxpayers are not entitled to deduct losses for such businesses as ordinary losses. Whipple v. Commissioner, supra↩ at 203.
10. "Cerebrum" is defined in Webster's New Collegiate Dictionary 180 (1979) as: "the expanded anterior portion of the brain that in higher mammals overlies the rest of the brain, consists of cerebral hemispheres and connecting structures, and is considered to be the seat of conscious mental processes," while the "cerebral cortex" is: "the surface layer of gray matter of the cerebral hemisphere."↩
11. It is unclear whether they signed solely as corporate officers, or whether they were guarantors or personally liable on the notes.↩